[No. S117816. July 31, 2006.]

CITY OF MARINA et al., Plaintiffs and Respondents, v.
BOARD OF TRUSTEES OF THE CALIFORNIA STATE UNIVERSITY,
Defendant and Appellant.

342

344

**COUNSEL**

Horvitz & Levy, John A. Taylor, Jr., Patricia Lofton; Miller, Starr & Regalia, Basil S. Shiber and Christian M. Carrigan for Defendant and Appellant.

James E. Holst, Alan C. Waltner and Jeffrey A. Blair for The Regents of the University of California as Amicus Curiae on behalf of Defendant and Appellant.

Miller Brown & Dannis, Marilyn J. Cleveland, Chad J. Graff and Kenneth S. Levy for Coalition for Adequate School Housing as Amicus Curiae on behalf of Defendant and Appellant.

Law Offices of Mary L. Hudson, Mary L. Hudson; Lombardo & Gilles, Sheri L. Damon; Law Offices of Robert Wellington and Kenneth D. Buchert for Plaintiffs and Respondents.

Manuela Albuquerque, City Attorney (Berkeley) and Zach Cowan, Assistant City Attorney, for League of California Cities and California State Association of Counties as Amici Curiae on behalf of Plaintiffs and Respondents.

McDonough Holland & Allen, Harriet A. Steiner and Kara K. Ueda for City of Davis as Amicus Curiae on behalf of Plaintiffs and Respondents.

Law Offices of Donald B. Mooney, Donald B. Mooney; Law Offices of Marsha A. Burch and Marsha A. Burch for San Joaquin Raptor Rescue Center, Protect Our Water and Central Valley Safe Environmental Network as Amici Curiae on behalf of Plaintiffs and Respondents.

Norma Turner, Mary-Alice Coleman and Jeffrey A. Diamond for West Davis Neighbors as Amicus Curiae on behalf of Plaintiffs and Respondents.

---

**OPINION**

**WERDEGAR, J.**—The Fort Ord Reuse Authority (FORA) challenges an environmental impact report (EIR) prepared by the Board of Trustees of the California State University (Trustees). The EIR concerns the Trustees' plan to expand a small campus into a major institution that will enroll 25,000 students. The planned expansion will have significant effects on the physical environment throughout Fort Ord, the former Army base on which the campus is located. While the Trustees have agreed to mitigate effects occurring on the campus itself, they have disclaimed responsibility for mitigating some effects occurring off campus. In particular, the Trustees have refused to share the cost of certain infrastructure improvements proposed by FORA, the base's new civilian governing authority. FORA challenges the Trustees' decision to certify the EIR despite the remaining, unmitigated effects as an abuse of discretion under the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) (CEQA). Like the superior court, we conclude the Trustees have abused their discretion and thus reverse the Court of Appeal's contrary decision.

## I. FACTUAL, LEGAL AND PROCEDURAL BACKGROUND

Fort Ord is a former United States Army base on the Pacific Coast, about five miles north of Monterey and 125 miles south of San Francisco. The base lies on the northern end of Monterey Bay, an important tourist destination known for its scenic beauty and historic sites. In 1994, the Department of Defense formally closed the base and transferred 27,000 acres (over 42 square miles) to a variety of governmental entities and local organizations. The closure created both problems and opportunities for the region. On one hand, the loss of one of the nation's largest military installations threatened to disrupt the local economy. On the other hand, valuable land that for over 75 years had been exclusively controlled by the Army became available for civilian economic development.

To provide a government for the former base and to manage its transition to civilian use, the Legislature enacted the Fort Ord Reuse Authority Act (Gov. Code, § 67650 et seq.) (hereafter the FORA Act or the act). Effective May 9, 1994, the act authorized FORA's creation and conferred upon it governmental powers and duties within the former base that prevail over those of any other local governmental entity. (*Id.*, § 67657, subd. (c).) FORA's general statutory purpose is "to plan for, finance, and carry out the transfer and reuse of the base in a cooperative, coordinated, balanced, and decisive manner." (Gov. Code, § 67652, subd. (a).) The act also charges FORA with the more specific policy goals of "facilitat[ing] the transfer and reuse of the real and other property [of the base] . . . with all practical speed," "minimiz[ing] the disruption caused by the base's closure on the civilian economy and the people of the Monterey Bay area," "maintain[ing] and protect[ing] the unique environmental resources of the area," and accomplishing these tasks "in ways that enhance the economy and quality of life of the Monterey Bay community." (*Id.*, § 67651, subds. (a)–(d).) The 13 members of FORA's governing board are appointed by local governments neighboring the base—Monterey County and the cities of Carmel, Del Rey Oaks, Marina, Monterey, Pacific Grove, Salinas, Sand City and Seaside. (*Id.*, § 67660.) Also on the board are 10 ex officio, nonvoting members, including one appointed by the Chancellor of the California State University. (*Id.*, § 67661.)

The charter for Fort Ord's future use and development is the statutorily mandated Base Reuse Plan (hereafter Reuse Plan), which FORA adopted on June 13, 1997. (See Gov. Code, § 67675 et seq.) The plan addresses land use, transportation, conservation, recreation and capital improvement in Fort Ord until the year 2015. (See *id.*, § 67675, subd. (c).) Pursuant to the plan, FORA will make land available over time for a wide range of civilian uses, including residential housing, business, light industry, research and development, visitor services, recreation and education. All such development will

require improvements to the infrastructure the Army left behind. Recognizing this, the Legislature gave FORA the power and duty to prepare the base's infrastructure for civilian development. In the words of the act, FORA "shall identify those basewide public capital facilities . . . that serve residents or will serve future residents of the base territory" (Gov. Code, § 67679, subd. (a)(1)) and "shall undertake to plan for and arrange the provision of those facilities, including arranging for their financing and construction or repair, remodeling, or replacement" (*ibid.*; see also *id.*, § 67675, subd. (c)(5) [Reuse Plan must include capital improvement plan]).

FORA has, as the Legislature directed, prepared a capital improvement plan identifying public facilities that need construction or improvement and projecting future expenditures for that purpose through the year 2015. (See Gov. Code, § 67675, subd. (c)(5).) The facilities FORA has identified include elements of Fort Ord's infrastructure for transportation (mainly roadways), water supply and distribution, wastewater management, drainage, and fire protection, among other things. FORA plans to improve these facilities over the life of the Reuse Plan, as increasing land use necessitates the improvements and as funding becomes available. Funding is not expected to come through legislative appropriations. Instead, the Legislature has directed FORA to arrange its own financing as it sees fit (Gov. Code, § 67679, subd. (a)(1)), employing any of several funding methods authorized in the FORA Act. FORA may, for example, "levy assessments, reassessments, or special taxes and issue bonds" under existing laws governing public finance (*id.*, § 67679, subd. (d)),[1] "levy development fees on development projects within the area of the base" (*id.*, § 67679, subd. (e)) pursuant to the Mitigation Fee Act (*id.*, § 66000 et seq.), sell or lease land (*id.*, § 67678, subd. (a)), and "seek state and federal grants and loans or other assistance" (*id.*, § 67679, subd. (c)). FORA and its local-government member agencies (*id.*, § 67660) may also provide by contract for the transfer of tax revenues (*id.*, § 67691) and/or adopt programs of local revenue sharing (*id.*, § 67692).

In order to determine the long-term financial viability of the Reuse Plan, FORA has prepared a Comprehensive Business Plan setting out assumptions about projected revenue and expenditures. As part of this exercise—one

---

[1] Specifically the Improvement Act of 1911 (Sts. & Hy. Code, § 5000 et seq.), the Improvement Bond Act of 1915 (*id.*, § 8500 et seq.), the Municipal Improvement Act of 1913 (*id.*, § 10000 et seq.), the Benefit Assessment Act of 1982 (Gov. Code, § 54703 et seq.), the Landscaping and Lighting Act of 1972 (Sts. & Hy. Code, § 22500 et seq.), the Integrated Financing District Act (Gov. Code, § 53175 et seq.), the Mello-Roos Community Facilities Act of 1982 (*id.*, § 53311 et seq.), the Infrastructure Financing District Act (*id.*, § 53395 et seq.), the Marks-Roos Local Bond Pooling Act of 1985 (*id.*, § 6584 et seq.), the Revenue Bond Law of 1941 (*id.*, § 54300 et seq.), a law permitting fire suppression assessments (*id.*, § 50078 et seq.), and the Habitat Maintenance Funding Act (Fish & G. Code, § 2900 et seq.). (See Gov. Code, § 67679, subd. (d).)

obviously subject to numerous contingencies given the long planning horizon—FORA has projected that it will spend $249.2 million to improve Fort Ord's infrastructure over the 20-year life of the Reuse Plan, i.e., from 1996 to 2015. FORA projects that the largest part of its operational revenue over the same period will derive from the sale of land and from a one-time special tax under the Mello-Roos Community Facilities Act of 1982 (Gov. Code, § 53311 et seq.). Other revenue is expected to come through local development fees, water and sewer fees, a grant from the federal Economic Development Administration, and the annual dues of FORA's members.

The California State University (CSU) is the largest university system in the United States. Governed by the Trustees, CSU's 23 campuses across the state collectively enroll 405,000 students and employ 44,000 faculty and staff. CSU Monterey Bay (CSUMB), which occupies 1,370 acres transferred by the Army to CSU in 1994, is presently the main user of the base. CSUMB opened in 1995 with 633 students, using existing military buildings, and now enrolls approximately 3,800 students, 2,600 of whom live on campus. From this modest beginning the Trustees plan to expand enrollment at CSUMB greatly over the next few decades, eventually reaching the target enrollment of 25,000 full-time equivalent (FTE)[2] students in the year 2030. On May 13, 1998, the Trustees approved a Campus Master Plan (hereafter Master Plan) to guide CSUMB toward this target. Under the Master Plan, CSUMB's resident population of students, faculty, staff and household members would gradually increase to 10,350. The campus's average daily population, which also includes students who commute, would grow to 19,000.

Together with the Master Plan for CSUMB, the Trustees also prepared and certified an EIR. The EIR is the focus of the environmental review process and, as we have explained, "the primary means" of achieving the state's declared policy of taking " 'all action necessary to protect, rehabilitate, and enhance the environmental quality of the state.' " (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392 [253 Cal.Rptr. 426, 764 P.2d 278], quoting Pub. Resources Code, § 21000, subd. (a); see also CEQA Guidelines,[3] § 15003, subd. (a).) The EIR's more specific purposes are "to identify the significant effects on the environment of a project, to identify alternatives to the project, and to indicate the manner in which those significant effects can be mitigated or avoided." (Pub. Resources Code, § 21002.1, subd. (a).) CEQA expressly

[2] One FTE student, a term used in the Trustees' planning documents, means any number of students collectively enrolled in 15 units, e.g., one student taking a full course load of 15 units, or three students taking five units each.

[3] The term "CEQA Guidelines" refers to the regulations codified in title 14, section 15000 et seq. of the California Code of Regulations, which have been "prescribed by the Secretary for Resources to be followed by all state and local agencies in California in the implementation of [CEQA]." (CEQA Guidelines, § 15000.)

requires that an EIR accompany the Master Plan for CSUMB. "The selection of a location for a particular campus and the approval of a long range development plan are subject to [CEQA] and require the preparation of an [EIR]." (*Id.*, § 21080.09, subd. (b).) The Trustees necessarily serve as the "lead agency" (*id.*, § 21067) responsible for preparing and certifying the EIR (*id.*, § 21100, subd. (a)) because they possess "full power and responsibility in the construction and development of any state university campus" (Ed. Code, § 66606) and thus final authority to approve or disapprove the Master Plan.

In their EIR for CSUMB, the Trustees have determined that expanding CSUMB to accommodate 25,000 students will have many significant effects on the physical environment of Fort Ord. CEQA requires "[e]ach public agency [to] mitigate or avoid the significant effects on the environment of projects that it carries out or approves whenever it is feasible to do so" (Pub. Resources Code, § 21002.1, subd. (b)), and to discuss feasible methods of mitigation in the EIR (*id.*, § 21100, subd. (b)(3); CEQA Guidelines, § 15126.4, subd. (a)(1); see also Pub. Resources Code, § 21002.1, subd. (a) [one purpose of the EIR is "to indicate the manner in which . . . significant effects can be mitigated or avoided"].) In fact, the Trustees' EIR does identify and adopt specific measures that the Trustees have found will mitigate most of the environmental effects of campus expansion to a level that is less than significant. Full mitigation of five remaining effects, however, will require action not just by the Trustees on the CSUMB campus but also by FORA on a basewide or regional basis. These remaining effects have become the subject of this litigation.

The Trustees' EIR describes the five remaining environmental effects, for which the Trustees have not provided full mitigation, as follows: (1) Drainage: "Construction of new buildings and facilities will increase impervious surfaces and runoff, and could result in localized drainage problems and/or flows exceeding storm drain capacities, if storm drainage facilities are not adequately sized and maintained." (2) Water supply: "CSUMB water demand will contribute incremental demands on existing deficient facilities and/or non-existent facilities." (3) Traffic: "Campus-related traffic will result in a decrease in level of service from D to E[4] at the [Light Fighter] Drive/North-South Road intersection[5] during the PM peak period in the year 2005, from D to E along

---

[4] A decrease in the level of service from D to E means, in the context of the EIR, that a road's capacity to handle the existing traffic is no longer minimally acceptable for an urban road.

[5] The Light Fighter Drive/North-South Road intersection is located, as the EIR explains, "near [t]he main regional entrance" to the CSUMB campus. This entrance has "the most convenient freeway access from State Highway 1 via Light Fighter Drive interchange and is

Del Monte Blvd. between Reindollar [Avenue] and Reservation Road[6] in the years 2005 and 2015, and will contribute to Highway 1 impacts in the years 2015 and 2030." (4) Wastewater management: "Campus growth will result in increased wastewater generation that can be accommodated by the existing wastewater treatment system, but will contribute flows to currently deficient sewer lines." (5) Fire protection: "Campus population and facility growth will result in increased demand for fire protection services."

■ Before a public agency, such as the Trustees, may approve a project for which the EIR has identified significant effects on the environment, such as the Master Plan for CSUMB, the agency must make one or more of the findings required by section 21081 of the Public Resources Code. The required findings constitute the principal means chosen by the Legislature to enforce the state's declared policy "that public agencies should not approve projects as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects . . . ." (*Id.*, § 21002; see also *id.*, § 21002.1, subd. (a).) More specifically, the agency must find that the project's significant environmental effects have been mitigated or avoided (*id.*, § 21081, subd. (a)(1)), that the measures necessary for mitigation "are within the responsibility and jurisdiction of another public agency and have been, or can and should be, adopted by that other agency" (*id.*, subd. (a)(2)), and/or that "specific economic, legal, social, technological, or other considerations" render mitigation "infeasible" (*id.*, subd. (a)(3)). When the agency finds that mitigation is infeasible, the agency must also find "that specific overriding economic, legal, social, technological, or other benefits of the project outweigh the significant effects on the environment." (*Id.*, subd. (b).)[7]

---

signed as the campus main entrance. Most trips from the Monterey Peninsula, Santa Cruz County, and the San Francisco Bay Area use this entrance. North-South Road is also an important local link to Seaside."

[6] This half-mile stretch of Del Monte Boulevard lies within the City of Marina and connects State Highway 1 with Reservation Road, which leads to the CSUMB campus.

[7] This important section of CEQA (Pub. Resources Code, § 21081) provides in full:

"Pursuant to the policy stated in Sections 21002 and 21002.1, no public agency shall approve or carry out a project for which an environmental impact report has been certified which identifies one or more significant effects on the environment that would occur if the project is approved or carried out unless both of the following occur:

"(a) The public agency makes one or more of the following findings with respect to each significant effect:

"(1) Changes or alterations have been required in, or incorporated into, the project which mitigate or avoid the significant effects on the environment.

"(2) Those changes or alterations are within the responsibility and jurisdiction of another public agency and have been, or can and should be, adopted by that other agency.

"(3) Specific economic, legal, social, technological, or other considerations, including considerations for the provision of employment opportunities for highly trained workers, make infeasible the mitigation measures or alternatives identified in the environmental impact report.

In their EIR, the Trustees have identified and adopted a variety of measures they have found will partially mitigate the five remaining environmental effects noted above. Full mitigation of these effects to the level of insignificance will, however, as the EIR specifically notes, require FORA to improve Fort Ord's infrastructure. In fact, FORA's own planning documents take the Trustees' plans for CSUMB into account and propose specific infrastructure improvements that will fully mitigate the expanding campus's remaining effects on water supply, drainage, wastewater management, traffic, and fire protection. Concerning each of these effects, the Trustees have declared in their formal findings certifying the EIR and approving the Master Plan (see Pub. Resources Code, § 21081) that the implementation of FORA's proposed improvements constitutes the "specific measure to mitigate [each of CSUMB's corresponding environmental impacts] to the level of insignificance . . . ."

As part of its long-term planning process, FORA adopted the assumption that CSUMB would pay, as its share of the cost of infrastructure improvements, 18 annual installments of $1.139 million each, beginning in fiscal year 1997/1998 and ending in fiscal year 2015/2016, for a total contribution over time of approxiamately $20.5 million. At the present time, however, FORA has not imposed any tax, fee or charge on CSUMB or proposed to do so. Instead, FORA hopes to reach agreement with the Trustees on their fair share of the cost of infrastructure improvements. The Trustees, however, have refused to contribute any amount to FORA for improvements in roads and fire protection, even while finding that FORA's proposed improvements constitute the specific measures necessary to mitigate CSUMB's effects in these areas. Accordingly, the Trustees cannot logically find and, indeed, have not found that CSUMB's effects have been fully mitigated. Instead, to justify certifying the EIR and approving the Master Plan despite the remaining, unmitigated effects, the Trustees rely on the following three alternative findings: (1) improvements to roads and fire protection are the responsibility of FORA rather than of the Trustees; (2) mitigation is infeasible because the Trustees may not legally contribute funds toward these improvements; and (3) the planned expansion of CSUMB offers overriding benefits that outweigh any remaining unmitigated effects on the environment.[8] (See Pub. Resources Code, § 21081, subds. (a)(2), (3) & (b).)

"(b) With respect to significant effects which were subject to a finding under paragraph (3) of subdivision (a), the public agency finds that specific overriding economic, legal, social, technological, or other benefits of the project outweigh the significant effects on the environment."

[8] Here, in their own words, is the Trustees' finding about CSUMB's effects on traffic: "The Board of Trustees finds that the specific measure to mitigate this impact to a level of insignificance is to implement the planned regional FORA transportation improvements, as identified in the FORA Reuse Plan and accompanying documents. Implementation of the planned regional improvements are [sic] within the responsibility of FORA (not the university). FORA can and should implement these measures. Because implementation of the

While the Trustees have refused to contribute any amount for improvements in roads and fire protection, they are willing to contribute for improvements in water supply, drainage and wastewater management, albeit not in the amount FORA has proposed. Instead, the Trustees propose to contribute through the procedure set out in chapter 13.7 of the Government Code (§ 54999 et seq.). Chapter 13.7 authorizes a public utility that is providing a public utility service to a public educational agency to impose a capital facilities fee on the latter "after agreement has been reached between the two agencies through negotiations entered into by both parties." (Gov. Code, § 54999.3, subd. (b).) The resulting dispute over the amount of the Trustees' contribution creates uncertainty about the extent to which CSUMB's off campus environmental effects will be mitigated. Accordingly, to justify certifying the EIR and approving the Master Plan for CSUMB, the Trustees have made alternative findings of the same type used to address CSUMB's effects on roads and fire protection. Specifically, the Trustees have found that (1) the basewide infrastructure improvements proposed by FORA constitute the specific measures necessary to mitigate CSUMB's effects to the level of insignificance, (2) the mitigation of CSUMB's effects on drainage, water supply, and wastewater management are FORA's responsibility, and (3) overriding circumstances justify certifying the EIR and approving the Master Plan despite any remaining unmitigated effects.[9]

In an appendix to the EIR addressing public comments, the Trustees explain why they have refused to contribute toward improvements in roads and fire protection, and why they have agreed to contribute toward improvements in drainage, water supply and wastewater management only through the procedure established in chapter 13.7 of the Government Code (§ 54999 et seq.), even though these decisions will leave some environmental effects

---

regional mitigation is currently disputed among the responsible agencies, mitigation of the impact to a less than significant level cannot be assured by CSU. It is hereby determined that any remaining unavoidable impacts are acceptable for the reasons specified in the Statement of Overriding Considerations . . . ."

The Trustees' finding about CSUMB's effects on fire protection is similar.

[9] Here, in their own words, is the Trustees' finding about CSUMB's effects on drainage: "The Board of Trustees finds that the specific measure to mitigate this impact to a level of insignificance is to implement the planned regional FORA drainage improvements, including ocean discharge improvements, and potential offsite percolation areas as identified in the FORA Reuse Plan and accompanying documents. CSUMB will contribute fees as mandated by applicable provisions of Government Code Section 54999 to mitigate its share of the impact. Implementation of the planned regional improvements is FORA's responsibility. It can and should implement these measures. They are, in fact, included in FORA's Reuse Plan. Drainage is presently adequate for university operations. As noted, there are current disputes regarding implementation of these measures; any remaining unavoidable impacts are acceptable as a worst case because of the reasons specified in the Statement of Overriding Considerations."

The Trustees' findings about water supply and wastewater management are similar.

unmitigated. Whether the Trustees, in view of the unmitigated effects, properly exercised their discretion to certify the EIR and to approve the Master Plan for CSUMB depends in large part on whether they have correctly understood the nature and scope of their obligation to contribute to FORA. We thus briefly summarize the relevant portion of the appendix, which effectively defined the issues in the lower courts and anticipated the Trustees' arguments in the present proceeding.

CSUMB's land, the Trustees observe in the appendix to the EIR, is exempt from taxation as "[p]roperty owned by the State" under article XIII, section 3, subdivision (a) of the California Constitution. This constitutional provision has been interpreted as implicitly immunizing state-owned property from special assessments imposed by local governments, except as authorized by the Legislature. (*San Marcos Water Dist. v. San Marcos Unified School Dist.* (1986) 42 Cal.3d 154, 160–161 [228 Cal.Rptr. 47, 720 P.2d 935] (*San Marcos*).) In reaction to *San Marcos*, the Legislature passed a law (chapter 13.7 of the Government Code, beginning with section 54999) authorizing any public agency that provides public utility services to a public educational agency to impose a "[c]apital facilities fee" on the latter "after agreement has been reached between the two agencies through negotiations entered into by both parties." (Gov. Code, § 54999.3, subd. (b).) This law, which addresses only fees intended to "pay the capital cost of a public utility facility" (*id.*, § 54999.1, subd. (b)), defines " '[p]ublic utility facility' " for these purposes as "a facility for the provision of water, light, heat, communications, power, or garbage service, for flood control, drainage or sanitary purposes, or for sewage collection, treatment, or disposal" (*id.*, subd. (d)). The FORA Act, in turn, provides that "[t]he applicability of any capital facilities fees imposed under this title [i.e., the FORA Act] to public educational agencies shall be subject to the provisions of Chapter 13.7 [of the Government Code] (commencing with Section 54999) . . . ." (Gov. Code, § 67685.)

Based on these authorities, the Trustees conclude in the appendix that the Legislature has in effect authorized FORA to impose fees on CSUMB for the purposes mentioned in chapter 13.7 of the Government Code (e.g., water, drainage and sewage; see *id.*, § 54999.1, subd. (d)) but not for any other purposes not mentioned (e.g., roads and fire protection). Any payment to FORA for a purpose not mentioned in the section, the Trustees conclude, even a voluntary payment made in order to mitigate CSUMB's environmental effects, would amount to an assessment prohibited by the state Constitution, as interpreted in *San Marcos, supra,* 42 Cal.3d 154, and constitute a gift of public funds. Having thus concluded that any contribution by CSUMB to mitigate the campus's effects on roads and fire protection would be unlawful, the Trustees further conclude that to mitigate these effects is "infeasible," presumably for "legal" reasons (see Pub. Resources Code, § 21081, subd. (a)(3)), and thus not required by CEQA because, in the Trustees' view,

overriding considerations justify proceeding with the project despite the unmitigated effects (see *id.*, § 21081, subd. (b)).

A lengthy statement of overriding considerations accompanies the Trustees' findings certifying the EIR and approving the Master Plan for CSUMB. In the statement, the Trustees reiterate the requirements of CEQA, the content of the EIR, the principal features of the Master Plan for CSUMB, and favorable public comments on the EIR. The following excerpts summarize some of the considerations underlying the Trustees' conclusion that campus expansion will offer benefits that outweigh any remaining unmitigated effects on the environment: "The CSU has identified the need for a university in the Monterey Bay area that addresses the projected demand for postsecondary education in the state of California by accommodating 25,000 [FTE students] at buildout. CSU recognizes official projections of future increases in the number of students to be served . . . which cannot be accommodated within [the] existing system capacity of the CSU. The reuse of Fort Ord for this purpose is particularly advantageous to the CSU because of the difficulty in acquiring campus-size parcels, the value of existing development on the site, and the attractive location of the site in the Monterey area. The master plan has been designed to provide an institution that will effectively serve the mission of the CSU system." In addition, development of the campus will offer higher education to "historically underrepresented populations and cultures of the state of California," "foster economic revitalization of a region impacted by closure of the largest residential military training facility in the nation" and "create job opportunities for approximately 2,760 faculty and staff as well as significant additional employment in university support activities."

On May 13, 1998, the Trustees adopted resolutions approving the statement of overriding considerations, certifying the EIR, and approving the Master Plan for CSUMB. Thereafter, FORA and the City of Marina filed separate petitions for writ of mandate challenging the Trustees' actions. The petitions alleged, among other things, that the Trustees had (1) failed to identify and adopt existing, feasible measures to mitigate significant effects on the environment described in the EIR, (2) improperly certified the EIR and approved the Master Plan despite the availability of feasible mitigation measures, (3) improperly disclaimed responsibility for mitigating CSUMB's environmental effects, and (4) improperly relied on a statement of overriding considerations to justify certifying the EIR and approving the Master Plan.

The superior court granted the petitions, issued its writ of mandate directing the Trustees to vacate their actions certifying the EIR and approving

the Master Plan, and to set aside the EIR's statement of overriding considerations. A divided Court of Appeal reversed. We granted FORA's petition for review.[10]

## II. DISCUSSION

The question before us is whether the Trustees have properly certified the EIR for CSUMB and, on that basis, approved the Master Plan. FORA contends the Trustees' decision must be vacated because three findings critical to their decision depend on an erroneous legal assumption, namely, that the California Constitution precludes them from contributing to FORA, even for the purpose of mitigating the environmental effects identified in the EIR, except as expressly permitted by chapter 13.7 of the Government Code (§ 54999 et seq.). The first two challenged findings are (1) that the Trustees cannot feasibly mitigate CSUMB's significant environmental effects and (2) that to mitigate CSUMB's effects is not the Trustees' responsibility. These two findings have, in turn, necessitated the third, which is (3) that overriding considerations justify certifying the EIR and approving the Master Plan despite the remaining unmitigated effects. (See generally Pub. Resources Code, § 21081.) We conclude FORA is correct and that the Trustees have abused their discretion.

We review the Trustees' decision, as CEQA directs, under the abuse of discretion standard. (See Pub. Resources Code, § 21168.5.) For these purposes, "[a]buse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (*Ibid.*) Although this standard would command much deference to factual and environmental conclusions in the EIR based on conflicting evidence (e.g., *Laurel Heights Improvement Assn. v. Regents of University of California, supra,* 47 Cal.3d 376, 393, 409), no such conclusions are here at issue. At issue, rather, are the Trustees' findings that mitigation is infeasible and that mitigation is not their responsibility. These findings depend on a disputed question of law—a type of question we review de novo. De novo review of legal questions is consistent with the abuse of discretion standard. In the context of review for abuse of discretion, an agency's "use of an erroneous legal standard constitutes a failure to proceed in a manner required by law." (*No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 88 [118 Cal.Rptr. 34, 529 P.2d 66]; see also *Save Our Peninsula*

---

[10] The Court of Appeal left undisturbed the superior court's additional conclusion that the Trustees had improperly failed to determine whether certain commercial developments contemplated in the Master Plan for CSUMB, including a retail mall, were consistent with FORA's Reuse Plan. CSUMB is exempt from land use regulation by FORA (including regulation under the Reuse Plan) only with respect to property "that is used for educational or research purposes." (Gov. Code, § 67678, subd. (f).) Profits from the developments in question are expected to generate as much as 30 percent of CSUMB's budget.

*Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 118 [104 Cal.Rptr.2d 326] ["questions of interpretation or application of the requirements of CEQA are matters of law"].) De novo review of legal questions is also consistent with the principle that, in CEQA cases, " '[t]he court does not pass upon the correctness of the EIR's environmental conclusions, but only upon its sufficiency as an 'informative document.' " (*Laurel Heights Improvement Assn. v. Regents of University of California, supra*, at p. 392, quoting *County of Inyo v. City of Los Angeles* (1977) 71 Cal.App.3d 185, 189 [139 Cal.Rptr. 396].) An EIR that incorrectly disclaims the power and duty to mitigate identified environmental effects based on erroneous legal assumptions is not sufficient as an informative document.

### A. *Is Mitigation Infeasible?*

#### 1. *Is mitigation infeasible because the Trustees may not lawfully contribute to FORA?*

■ We consider first the Trustees' finding that they cannot feasibly mitigate the environmental effects of their plan to expand the CSUMB campus. CEQA defines " '[f]easible' " for these purposes as "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors." (Pub. Resources Code, § 21061.1.) To this list, the CEQA Guidelines add "legal" factors. (CEQA Guidelines, § 15364; see also Pub. Resources Code, § 21081, subd. (a)(3).) The Trustees, by arguing the state Constitution prohibits them from voluntarily contributing funds to FORA as a form of mitigation, in effect take the position that such contributions are legally infeasible. We discuss here only the permissibility of voluntary payments by the Trustees. Some of the public financing laws that FORA has the power to invoke (see Gov. Code, § 67679, subd. (d)) would, as the Trustees acknowledge, permit FORA to assess state-owned property such as the CSUMB campus. FORA has not, however, attempted to impose an assessment.

■ The plain language of the California Constitution does not support the Trustees' position that voluntary mitigation payments are impermissible. The provision on which the Trustees rely, article XIII, section 3, subdivision (a), provides simply that "[p]roperty owned by the State" is "exempt from property taxation . . . ." FORA has not imposed a tax on the Trustees. We have, however, interpreted the same constitutional provision as implicitly exempting publicly owned property from special assessments made without legislative authority. (*Inglewood v. County of Los Angeles* (1929) 207 Cal. 697, 703–704 [280 P. 360]; see also *Regents of University of California v. City of Los Angeles* (1979) 100 Cal.App.3d 547, 549 [160 Cal.Rptr. 925]; *County of Riverside v. Idyllwild County Water Dist.* (1978) 84 Cal.App.3d 655, 659–660

[148 Cal.Rptr. 650]; cf. *Regents of University of California v. City of Los Angeles* (1983) 148 Cal.App.3d 451, 454, fn. 2 [196 Cal.Rptr. 14] [questioning whether the exemption is grounded in policy considerations rather than the Constitution].)[11] We reaffirmed this conclusion in *San Marcos, supra,* 42 Cal.3d 154, 160–161, the case on which the Trustees principally rely. The Trustees, as noted, argue based on *San Marcos* that any payment by themselves to FORA for the purpose of improving Fort Ord's infrastructure would constitute a special assessment prohibited in the absence of legislative authority. The Trustees find in chapter 13.7 of the Government Code (§ 54999 et seq.) legislative authority for payments related to subjects mentioned therein, such as water, drainage and sewage collection (*id.,* § 54999.1, subd. (d)), but not for any purpose not mentioned, such as roads and fire protection.

The Trustees have misinterpreted *San Marcos, supra,* 42 Cal.3d 154. The decision addresses only compulsory charges imposed by one public entity on another. The case has nothing to say about a discretionary payment made by a public agency that voluntarily chooses that method of discharging its duty under CEQA to mitigate the environmental effects of its project. Because the Trustees' interpretation of *San Marcos* critically underlies their position in this case, we examine the decision and its consequences in detail.

At issue in *San Marcos, supra,* 42 Cal.3d 154, was the validity of a "capacity fee" (*id.,* at p. 157) imposed by a public water district on a public school district. The specific question was whether the capacity fee was a user fee, which the school district conceded it would have to pay, or a special assessment, from which the school district was exempt under the cases cited above. The court held the school district was exempt. The purpose of the fee was not to pay for water service but to provide a source of funds for capital improvements to the water system. (*Id.,* at p. 159.) The capacity fee thus fit the definition of a special assessment as " 'a compulsory charge placed by [the government] upon real property within a pre-determined district, made under express legislative authority for defraying in whole or in part the expense of a permanent public improvement therein . . . .' " (*San Marcos,* at p. 161, quoting *Spring Street Co. v. City of Los Angeles* (1915) 170 Cal. 24, 29 [148 P. 217].) In applying this definition, the court "look[ed] to the *purpose* of the fee being charged, and not simply to the *form* of the fee, a matter which can be easily manipulated." (*San Marcos,* at p. 163.) Accordingly, the court attributed no significance to the fact the water district had calculated the

---

[11] But see California Constitution, article XIIID, section 4: "Parcels within a district that are owned or used by any agency, the State of California or the United States shall not be exempt from assessment unless the agency can demonstrate by clear and convincing evidence that those publicly owned parcels in fact receive no special benefit." (Added by initiative measure Prop. 218, § 4, approved by the electorate Nov. 5, 1996.)

charge by reference to the volume of water the school district anticipated using—a characteristic typical of user fees. While the assessment's form thus caused it to resemble a user fee in some respects, the water district was not permitted " 'to do indirectly that which it could not do directly.' " (*Ibid.*, quoting *County of Riverside v. Idyllwild County Water Dist., supra,* 84 Cal.App.3d 655, 659–660.)

■ In summary, the court in *San Marcos, supra,* 42 Cal.3d 154, announced two holdings: the court reiterated the existing rule that publicly owned property was exempt from special assessment absent " 'positive legislative authority therefor' " (*id.*, at p. 161, quoting *Inglewood v. County of Los Angeles, supra,* 207 Cal. 697, 704), and the court determined that the particular charge at issue was an assessment rather than a user fee (*San Marcos,* at pp. 163–165). The court found analogous support for its conclusions in prior decisions identifying "[t]he rationale behind a public entity's exemption from property taxes and special assessments [as being] to prevent one tax-supported entity from siphoning tax money from another such entity; the end result of such a process [possibly being] unnecessary administrative costs and no actual gain in tax revenues." (*San Marcos,* at p. 161, citing *Eisley v. Mohan* (1948) 31 Cal.2d 637, 642 [192 P.2d 5].) The court also acknowledged, perhaps bluntly, one of the more significant consequences of its holding: "Our conclusion does not mean," the court wrote, "that the water district cannot collect money for capital improvements from its customers; it simply means that the *private* customers will pay the entire cost of capital improvements. Public entities, such as the school district, will not be required to allocate their limited tax revenues to pay for capital improvements built by the sewer district." (*San Marcos,* at p. 158.)

The Legislature promptly reacted to the decision in *San Marcos, supra,* 42 Cal.3d 154, by authorizing public utilities to charge public-entity customers their fair share of the utilities' capital costs and by ratifying fees previously imposed for that purpose. Under chapter 13.7 of the Government Code (§ 54999 et seq.), enacted in response to *San Marcos,* "[a]ny public agency providing public utility service" may impose on any public agency a "capital facilities fee" (*id.*, § 54999.2), meaning "any nondiscriminatory charge to pay the capital cost of a public utility facility" (*id.*, § 54999.1, subd. (b)). A " '[p]ublic utility facility' " for these purposes is "a facility for the provision of water, light, heat, communications, power, or garbage service, for flood control, drainage or sanitary purposes, or for sewage collection, treatment, or disposal." (*Id.*, § 54999.1, subd. (d).) Motivating these changes to the law was the Legislature's perception that public utilities and their public-entity customers, on the whole, had not shared the court's understanding of the law. "[M]any public entities that provide public utility service," the Legislature explained, "have imposed capital facilities fees applicable to users of public utility facilities in order to equitably apportion the cost of capital facilities

construction or expansion required by all public and private users of the facilities." As a result of *San Marcos*, however, "the fiscal stability and service capabilities of the affected public utility service agencies which have in good faith collected and spent these fees for capital improvements are seriously impaired as is the ability to finance essential future facilities." (Gov. Code, § 54999, subd. (a).)

Against this background, we may easily reject the Trustees' argument that they may not lawfully contribute to FORA as a way of discharging their obligation under CEQA to mitigate the environmental effects of their project to expand CSUMB. The Trustees' three-part argument may be summarized as follows: (1) Any payment by the Trustees to FORA for the purpose of capital improvement in Fort Ord is an assessment, regardless of form; (2) public agencies are exempt from assessment except as permitted by the Legislature; and (3) the Legislature has permitted assessments only for the purposes set out in chapter 13.7 of the Government Code (§ 54999 et seq.).

█ The Trustees err crucially at the outset. An assessment connotes, at the very least, a compulsory charge imposed by the government on real property. (*Knox v. City of Orland* (1992) 4 Cal.4th 132, 141 [14 Cal.Rptr.2d 159, 841 P.2d 144]; see also *Southern Cal. Rapid Transit Dist. v. Bolen* (1992) 1 Cal.4th 654, 660 [3 Cal.Rptr.2d 843, 822 P.2d 875]; *San Marcos, supra,* 42 Cal.3d 154, 161; *Spring Street Co. v. City of Los Angeles, supra,* 170 Cal. 24, 29.) FORA has imposed no charge on the Trustees, let alone a compulsory one. As part of its planning process, FORA has made a provisional effort to estimate the Trustees' fair share of the cost of infrastructure improvements, but FORA has taken no steps to create an enforceable legal obligation to pay. Indeed, FORA disclaims any intention to impose a charge on the Trustees and looks instead exclusively to a negotiated payment. This case is not a collection action or an action to validate an assessment. █ Instead, FORA claims the Trustees have abused their discretion under CEQA by certifying an EIR that improperly fails to identify voluntary contributions to FORA as a feasible method of mitigating the environmental effects of their project to expand CSUMB.

In other words, the question of payment arises not because FORA has imposed a charge (it has not), but because CEQA requires the Trustees to avoid or mitigate, if feasible, the significant environmental effects of their project (Pub. Resources Code, § 21002.1, subd. (b)) and because payments to FORA may represent a feasible form of mitigation. To illustrate the point, if campus expansion requires that roads or sewers be improved, the Trustees may do the work themselves on campus, but they have no authority to build roads or sewers off campus on land that belongs to others. Yet the Trustees are not thereby excused from the duty to mitigate or avoid CSUMB's

off-campus effects on traffic or wastewater management, because CEQA requires a public agency to mitigate or avoid its projects' significant effects not just on the agency's own property but *"on the environment"* (Pub. Resources Code, § 21002.1, subd. (b), italics added), with "environment" defined for these purposes as "the physical conditions which exist *within the area which will be affected by a proposed project"* (*id.*, § 21060.5, italics added). Thus, if the Trustees cannot adequately mitigate or avoid CSUMB's off-campus environmental effects by performing acts on campus (as by reducing sufficiently the use of automobiles or the volume of sewage), then to pay a third party such as FORA to perform the necessary acts off campus may well represent a feasible alternative. A payment made under these circumstances can properly be described neither as compulsory nor, for that reason, as an assessment.

Arguing to the contrary, the Trustees emphasize the court's statement in *San Marcos, supra,* 42 Cal.3d 154, 163, that courts will identify an assessment by "look[ing] to the *purpose* of the fee being charged, and not simply to the *form* of the fee, a matter which can be easily manipulated." Based on this statement, the Trustees argue that a voluntary payment made to fund projects that might also be funded by an assessment, such as infrastructure projects, must be considered an assessment for all purposes. The *San Marcos* court announced no such conclusion. Instead, the court made the quoted statement in the context of determining whether an admittedly compulsory charge was a user fee or an assessment. Nothing in *San Marcos* speaks to *voluntary* payments or purports to address or narrow any public agency's duties under CEQA.

The Trustees also seek to draw support from the court's statement in *San Marcos, supra,* 42 Cal.3d 154, of the reason traditionally thought to underlie the rule exempting public property from taxation, i.e., that the exemption "prevent[s] one tax-supported entity from siphoning tax money from another such entity; the end result of such a process [possibly being] unnecessary administrative costs and no actual gain in tax revenues." (*Id.*, at p. 161.) Inviting an analogy, the Trustees point out that any payment by CSU to FORA for infrastructure improvements will reduce the amount of money available to CSU for its core educational functions. The Trustees read too much into *San Marcos*. While there does exist a general rule to the effect that "[p]roperty owned by the State" is exempt from taxation (Cal. Const., art. XIII, § 3, subd. (a)), no rule precludes a public entity from sharing with another the cost of improvements benefiting both. Furthermore, while education may be CSU's core function, to avoid or mitigate the environmental effects of its projects is also one of CSU's functions. This is the plain import of CEQA, in which the Legislature has commanded that "[e]ach public agency shall mitigate or avoid the significant effects on the environment of projects that it carries out or approves whenever it is feasible to do so." (Pub.

Resources Code, § 21002.1, subd. (b), italics added; see also *id.*, § 21002 [declaring the same obligation to be "the policy of the state"].) Nothing in *San Marcos* can fairly be read as addressing, much less narrowing, a public agency's obligations under CEQA.

The Trustees, as noted, are willing to contribute to FORA for the limited purpose of mitigating CSUMB's effects on drainage, water supply, and wastewater management under the terms of chapter 13.7 of the Government Code (§ 54999 et seq.). Chapter 13.7, as already explained, contains the law the Legislature passed in the wake of *San Marcos, supra,* 42 Cal.3d 154, authorizing public utilities to charge public-entity customers their fair share of the utilities' capital costs. Under the law, "any public agency proposing to initially impose a capital facilities fee . . . may do so after agreement has been reached between the two agencies through negotiations entered into by both parties." (Gov. Code, § 54999.3, subd. (b).) In such a case, "[t]he public agency imposing . . . the capital facilities fee has the burden of producing evidence to establish that the capital facilities fee is nondiscriminatory and that the amount of the capital facilities fee does not exceed the amount necessary to provide capital facilities for which the fee is charged." (*Id.*, subd. (c).) The FORA Act expressly invokes this negotiative process by specifying that "[t]he applicability of any capital facilities fees imposed under this title [i.e., the FORA Act] to public educational agencies shall be subject to the provisions of Chapter 13.7 . . . ." (Gov. Code, § 67685.)

Because FORA has not imposed or sought to impose a capital facilities fee on the Trustees, chapter 13.7 does not literally apply. That having been said, we see no reason why an agreement between the Trustees and FORA regarding a voluntary payment negotiated according to the procedure set out in chapter 13.7 for the purpose of mitigating specified environmental effects (i.e., water supply, drainage and wastewater management) would not satisfy the Trustees' CEQA obligations as to those effects. While the amount determined by negotiation may not equal the amount FORA originally projected, for its own planning purposes, that the Trustees would pay, nothing in chapter 13.7 of the Government Code, CEQA or the FORA Act permits FORA unilaterally to determine the amount of any *voluntary* contribution the Trustees may choose to make as a way of satisfying their obligation under CEQA to mitigate the environmental effects of their project. To the contrary, the Trustees as the lead agency under CEQA have the power and duty to assess the adequacy of mitigation measures, subject only to judicial review for abuse of discretion. (See *Laurel Heights Improvement Assn. v. Regents of University of California, supra,* 47 Cal.3d 376, 393.) Furthermore, nothing in chapter 13.7 of the Government Code, CEQA or the FORA Act obliges the Trustees to pay more than is necessary to mitigate CSUMB's effects. Certainly the Trustees need not pay to mitigate effects caused by other users of the base. To the contrary, CEQA requires that

mitigation measures "be 'roughly proportional' to the impacts of the project." (CEQA Guidelines, § 15126.4, subd. (a)(4)(B), citing *Dolan v. City of Tigard* (1994) 512 U.S. 374 [129 L.Ed.2d 304, 114 S.Ct. 2309]; cf. *id.*, at p. 391.)[12]

Finally on this point, the Trustees argue that chapter 13.7 of the Government Code (§ 54999 et seq.) and the FORA Act (*id.*, § 67650 et seq.), which specifically authorize FORA to impose on the Trustees a negotiated fee for certain purposes (e.g., water supply, drainage and wastewater management), suggest the Legislature must have contemplated the Trustees would have no obligation to contribute to FORA for other purposes (e.g., the cost of improving roads and fire protection). We discern in the cited provisions, however, no evidence of a legislative intent to bar the Trustees from voluntarily contributing, as a way of meeting their CEQA obligations, their fair share of the cost of improvements to roads and fire protection necessitated by CSUMB's expansion. On this point the FORA Act, as noted, provides simply that "[t]he applicability of any capital facilities fees *imposed* under this title to public educational agencies shall be subject to the provisions of Chapter 13.7 [of the same code]." (Gov. Code, § 67685, italics added.) Chapter 13.7, in turn, speaks only of fees "*impose[d]*" (Gov. Code, § 54999.3, subd. (b), italics added) by public utilities. Because FORA has imposed no fee on the Trustees, neither Government Code section 67685 nor chapter 13.7 has any literal application to the present case. Moreover, neither law purports to limit the Trustees' independent obligation under CEQA to protect the physical environment from the effects of their project to expand the CSUMB campus.

> 2. *Is mitigation infeasible because a contribution by the Trustees to FORA would amount to a prohibited gift of public funds?*

The Trustees next argue that any payment to FORA made otherwise than under Government Code chapter 13.7 (§ 54999 et seq.) would constitute an illegal gift of public funds. (See Cal. Const., art. XVI, § 6.)[13] The argument invokes the court's statement in *San Marcos, supra,* 42 Cal.3d 154, that the ability of the school district in that case to "agree to pay [the disputed capacity] charge depend[ed] upon whether the [water] district ha[d] the power to impose it," and that payment of an invalid charge "would amount to a 'gift

---

[12] Similarly, chapter 13.7 of the Government Code, although not here literally applicable, requires that payments by a public agency to a public utility for capital facilities be "nondiscriminatory" and that they "not exceed the amount necessary to provide capital facilities for which the fee is charged." (Gov. Code, § 54999.3, subd. (c).)

[13] "[N]or shall [the Legislature] have power to make any gift or authorize the making of any gift, of any public money or thing of value to any individual, municipal or other corporation whatever . . . ." (Cal. Const., art. XVI, § 6.) We have long assumed that this constitutional prohibition, applicable by its terms only to the Legislature, also applies to public agencies. (E.g., *Santa Barbara etc. Agency v. All Persons* (1957) 47 Cal.2d 699, 707 [306 P.2d 875].)

of public funds' in contravention of article XVI, section 6 of the California Constitution." (*San Marcos*, at p. 167, quoting *County of Riverside v. Idyllwild County Water Dist., supra*, 84 Cal.App.3d 655, 660.) We have, however, already rejected the central premise of this argument, which is that a voluntary payment by the Trustees would constitute an assessment.

■ In any event, the relevant law makes clear that a payment by the Trustees for the purpose of mitigating CSUMB's environmental effects would not constitute an unlawful gift of public funds. "It is well settled that, in determining whether an appropriation of public funds or property is to be considered a gift, the primary question is whether the funds are to be used for a 'public' or a 'private' purpose. If they are for a 'public purpose', they are not a gift within the meaning of [the Constitution]." (*County of Alameda v. Janssen* (1940) 16 Cal.2d 276, 281 [106 P.2d 11].) Such a payment by the Trustees would have the public purpose of discharging their duty as a public agency, under the express terms of CEQA, to "mitigate or avoid the significant effects on the environment of projects that [they] carr[y] out or approve[] whenever it is feasible to do so." (Pub. Resources Code, § 21002.1, subd. (b).)

> 3. *Is mitigation infeasible because the Trustees cannot guarantee that FORA will actually implement the proposed infrastructure improvements?*

As a final reason why they cannot feasibly mitigate CSUMB's environmental effects by voluntarily contributing to FORA, the Trustees argue they cannot guarantee that FORA will actually implement the infrastructure improvements proposed in the Reuse Plan. The argument is not persuasive.

In certifying the EIR and approving CSUMB's Master Plan, the Trustees specifically found that the infrastructure improvements proposed by FORA constitute the "specific measure[s]" necessary to mitigate each of CSUMB's corresponding environmental impacts to the level of insignificance. The Trustees did not find that mitigation of these impacts was feasible, however, in part because of asserted doubts about FORA's ability to fund and implement the proposed improvements. CEQA, as noted, defines a " '[f]easible' " mitigation measure as one that is "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors." (Pub. Resources Code, § 21061.1; see also CEQA Guidelines, § 15364.) Invoking this definition, the Trustees found in the EIR as to each remaining environmental impact that "implementation of the regional mitigation . . . is currently disputed, [and that] mitigation of the impact to a less than significant level cannot be assured by CSU."

The Trustees explained their position in more detail in response to public comments on their EIR: "Although all parties to the MOA[14] will agree that the determined contributions by CSUMB are intended to mitigate the offsite impacts contributed by development of the Master Plan, it is acknowledged that CSUMB's contribution represents only a portion of the funding needed to implement the regional improvements. Similar payments will need to be made by other jurisdictions contributing to regional impacts in order for the improvements to be implemented. In addition, ultimate implementation of the improvement program is under the responsibility of FORA, and cannot be controlled or assured by the University. For these reasons, . . . the [EIR] determine[s] that the significant impacts on drainage, water supply, traffic, wastewater generation, and fire protection, identified as caused by the Master Plan, will remain significant and unavoidable. These impacts will therefore require the adoption of a Statement of Overriding Conditions by the [Trustees] in compliance with CEQA."

■ The presently identified, unavoidable uncertainties affecting the funding and implementation of the infrastructure improvements FORA has proposed in its Reuse Plan do not render voluntary contributions to FORA by the Trustees infeasible as a method of mitigating CSUMB's effects. Both the CEQA Guidelines and judicial decisions recognize that a project proponent may satisfy its duty to mitigate its own portion of a cumulative environmental impact by contributing to a regional mitigation fund. Under the Guidelines, "a project's contribution to a significant cumulative impact" may properly be considered "less than cumulatively considerable and thus . . . not significant" "if the project is required to implement or fund its fair share of a mitigation measure or measures designed to alleviate the cumulative impact." (CEQA Guidelines, § 15130, subd. (a)(3).) Similarly, courts have found fee-based mitigation programs for cumulative impacts, based on fair-share infrastructure contributions by individual projects, to constitute adequate mitigation measures under CEQA. (E.g., *Anderson First Coalition v. City of Anderson* (2005) 130 Cal.App.4th 1173, 1188 [30 Cal.Rptr.3d 738]; *Save Our Peninsula Committee v. Monterey County Bd. of Supervisors, supra,* 87 Cal.App.4th 99, 140.)[15]

---

[14] That is, a memorandum of agreement proposed by the Trustees to implement their proposal to contribute funds pursuant to chapter 13.7 of the Government Code (§ 54999 et seq.) for improvements in water supply, drainage and wastewater management.

[15] The Trustees assert that courts have not permitted *public* entities, as opposed to *private* entities, to mitigate their projects' contributions to cumulative impacts by paying into regional mitigation funds. The single decision on which the Trustees rely, however, is not on point. The court in *Goleta Union School Dist. v. Regents of University of California* (1995) 37 Cal.App.4th 1025 [44 Cal.Rptr.2d 110], held that the Regents of the University of California had no obligation to propose, in an EIR addressing a project to expand the University of California at Santa Barbara, methods for alleviating overcrowding in local public schools expected to result from the project. The basis for the court's holding was that CEQA requires consideration only

 "Of course a commitment to pay fees without any evidence that mitigation will actually occur is inadequate." (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors, supra,* 87 Cal.App.4th 99, 140; see also *Kings County Farm Bureau v. City of Hanford* (1990) 221 Cal.App.3d 692, 727–728 [270 Cal.Rptr. 650] [lacking evidence water would be available for purchase, an agreement to purchase replacement water did not adequately mitigate groundwater depletion].) There is, however, no reason to doubt that FORA will meet its statutory obligation as the government of Fort Ord to prepare the base for civilian development by constructing whatever public capital facilities are necessary for that purpose. (See Gov. Code, § 67679.) As noted, FORA plans to implement the improvements over a period of several years, as increasing land use necessitates them and as funding becomes available. To enable this task to be accomplished, the Legislature has given FORA a broad array of fundraising powers, including the power to levy assessments and development fees, to share tax revenue with its local-government member agencies, and to sell and lease property. (See Gov. Code, §§ 67678, subd. (a), 67679, subds. (c)–(e), 67691, 67692.) Furthermore, the law specifically directs FORA to use its powers to ensure the success of its statutory mission (e.g., Gov. Code, § 67679, subd. (a)(1) [FORA must "undertake to plan for and arrange the provision of [public capital] facilities, including arranging for their financing and construction"]), and the courts ordinarily presume that the government, in this instance FORA, will comply with the law (e.g., *City of Beaumont v. Beaumont Irr. Dist.* (1965) 63 Cal.2d 291, 297 [46 Cal.Rptr. 465, 405 P.2d 377]; *Save Our Peninsula Committee v. Monterey County Bd. of Supervisors, supra,* 87 Cal.App.4th 99, 141).

By way of analogy, the court in *Save Our Peninsula Committee v. Monterey Bd. of Supervisors, supra,* 87 Cal.App.4th 99, held that a county had adequately ensured the mitigation of traffic congestion effects by "provid[ing] for improvements to be constructed as the traffic triggering the need for the improvements exceeded a projected threshold and the funds to pay for the improvements were generated by the new development." (*Id.,* at p. 141.) CEQA, the court explained, required not "a time-specific schedule for the County to complete specified road improvements" (*ibid.*) but only "that there be a reasonable plan for mitigation" (*ibid.*). FORA's Reuse Plan satisfies that criterion. The Trustees' assumption that CEQA requires more is an error of law invalidating their finding that voluntary mitigation payments to FORA do not represent a feasible method of mitigating CSU's off-campus environmental effects. (*No Oil, Inc. v. City of Los Angeles, supra,* 13 Cal.3d 68, 88 [an

---

of "physical change[s]" in the environment (Pub. Resources Code, § 21065; cf. *id.,* § 21060.5), and that the "[e]conomic or social effects of a project shall not be treated as significant effects on the environment" (CEQA Guidelines, § 15131, subd. (a)). (See *Goleta Union School Dist. v. Regents of University of California, supra,* at pp. 1030–1033.)

agency's "use of an erroneous legal standard constitutes a failure to proceed in a manner required by law"]; see also *Save Our Peninsula Committee v. Monterey County Bd. of Supervisors*, *supra*, 87 Cal.App.4th 99, 118 ["questions of interpretation or application of the requirements of CEQA are matters of law"].)

### B. *Is Mitigation Exclusively the Responsibility of FORA?*

CEQA, as previously noted, does not require a public agency to undertake identified mitigation measures, even if those measures are necessary to address the project's significant environmental effects, if the agency finds that the measures "are within the responsibility and jurisdiction of another public agency and have been, or can and should be, adopted by that other agency." (Pub. Resources Code, § 21081, subd. (a)(2).) The Trustees have made such a finding with respect to the measures necessary to mitigate CSUMB's projected effects on drainage, water supply, wastewater management, traffic, and fire protection. As to each such effect, the Trustees have found that "the specific measure to mitigate [each] impact to a level of insignificance is to implement the planned regional FORA . . . improvements," and that "[i]mplementation of the planned regional improvements is FORA's responsibility."

Certainly FORA has responsibility for implementing the infrastructure improvements it has proposed. (See Gov. Code, § 67679.) Just as certainly, however, the FORA Act contemplates that the costs of those improvements will be borne by those who benefit from them. (See Gov Code, § 67679.) A finding by a lead agency under Public Resources Code section 21081, subdivision (a)(2), disclaiming the responsibility to mitigate environmental effects is permissible only when the other agency said to have responsibility has *exclusive* responsibility. As the CEQA Guidelines explain, "[t]he finding in subsection (a)(2) shall not be made if the agency making the finding has concurrent jurisdiction with another agency to deal with identified feasible mitigation measures or alternatives." (CEQA Guidelines, § 15091, subd. (c).) The Guidelines' logical interpretation of CEQA on this point "avoids the problem of agencies deferring to each other, with the result that no agency deals with the problem. This result would be contrary to the strong policy [requiring the mitigation or avoidance of significant environmental effects] declared in Sections 21002 and 21002.1 of the statute." (Discussion of Resources Agency following CEQA Guidelines, § 15091; see also 1 Kostka, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2005) § 17.19, pp. 821–823.)

The Trustees offer two arguments in support of their finding disclaiming responsibility for the measures necessary to mitigate CSUMB's off-campus environmental effects. Neither withstands close scrutiny. The Trustees' first

argument—that they may not lawfully contribute to FORA in view of *San Marcos, supra,* 42 Cal.3d 154, and the constitutional exemption of state property from taxation (Cal. Const., art. XIII, § 3, subd. (a))—has already been considered and rejected. The Trustees' second argument—that they lack the power to construct infrastructure improvements away from campus on land they do not own and control—is beside the point. Certainly the Trustees may not enter the land of others to widen roads and lay sewer pipe; CEQA gives the Trustees no such power. (See Pub. Resources Code, § 21004 ["[i]n mitigating or avoiding a significant effect of a project on the environment, a public agency may exercise only those express or implied powers provided by law other than this division."].) CEQA does not, however, as we have explained, limit a public agency's obligation to mitigate or avoid significant environmental effects to effects occurring on the agency's own property. (See Pub. Resources Code, §§ 21002.1, subd. (b), 21060.5.) CEQA also provides that "[a]ll state agencies . . . shall request in their budgets the funds necessary to protect the environment in relation to problems caused by their activities." (*Id.,* § 21106.) Thus, as we have also explained, if the Trustees cannot adequately mitigate or avoid CSUMB's off-campus environmental effects by performing acts on the campus, then to pay a third party such as FORA to perform the necessary acts off campus may well represent a feasible alternative.

To be clear, we do not hold that the duty of a public agency to mitigate or avoid significant environmental effects (Pub. Resources Code, § 21002.1, subd. (b)), combined with the duty to ask the Legislature for money to do so (*id.,* § 21106),[16] will always give a public agency that is undertaking a project with environmental effects shared responsibility for mitigation measures another agency must implement. Some mitigation measures cannot be purchased, such as permits that another agency has the sole discretion to grant or refuse. Moreover, a state agency's power to mitigate its project's effects through voluntary mitigation payments is ultimately subject to legislative control; if the Legislature does not appropriate the money, the power does not exist. For the same reason, however, for the Trustees to disclaim responsibility for making such payments before they have complied with their statutory obligation to ask the Legislature for the necessary funds is premature, at the very least. The superior court found no evidence the Trustees had asked the Legislature for the funds. In their brief to this court, the Trustees acknowledge they did not budget for payments they assumed would constitute invalid assessments under *San Marcos, supra,* 42 Cal.3d 154. That assumption, as we have explained, is invalid.

---

[16] "All state agencies, boards, and commissions shall request in their budgets the funds necessary to protect the environment in relation to problems caused by their activities." (Pub. Resources Code, § 21106.)

### C. *Do Overriding Circumstances Justify Approving the Campus Master Plan?*

When a public agency has found that a project's significant environmental effects cannot feasibly be mitigated, the agency may nevertheless proceed with the project if it also finds "that specific overriding economic, legal, social, technologiacal, or other benefits of the project outweigh the significant effects on the environment." (Pub. Resources Code, § 21081, subd. (b).) The Trustees, as noted, have made such a finding with respect to each of the remaining, unmitigated environmental impacts on drainage, water supply, wastewater management, traffic and fire protection.

If we agreed with the Trustees that mitigation were infeasible for the reasons given in the findings, i.e., that the Trustees may not legally contribute to FORA and that the Trustees cannot ensure that FORA will actually construct infrastructure improvements—we would give much deference to the Trustees' weighing of the project's benefits against the remaining environmental effects. Generally speaking, "a court's proper role in reviewing a challenged EIR is not to determine whether the EIR's ultimate conclusions are correct but only whether they are supported by substantial evidence and whether the EIR is sufficient as an informational document." (*Laurel Heights Improvement Assn. v. Regents of University of California, supra*, 47 Cal.3d 376, 407.) Moreover, an agency's decision that the specific benefits a project offers outweigh any environmental effects that cannot feasibly be mitigated, while subject to review for abuse of discretion (Pub. Resources Code, § 21168.5), lies at the core of the lead agency's discretionary responsibility under CEQA and is, for that reason, not lightly to be overturned. (Cf. *Laurel Heights Improvement Assn. v. Regents of University of California, supra*, 47 Cal.3d 376, 392 [court reviews the EIR's sufficiency as an informative document and not the correctness of its environmental conclusions].)

In this case, however, the Trustee's statement of overriding considerations is invalid for a reason that does not require us to reweigh benefits and detriments, or to inquire into the statement's factual basis. A statement of overriding considerations is required, and offers a proper basis for approving a project despite the existence of unmitigated environmental effects, only when the measures necessary to mitigate or avoid those effects have properly been found to be infeasible. (Pub. Resources Code, § 21081, subd. (b).) Given our conclusion the Trustees have abused their discretion in determining that CSUMB's remaining effects cannot feasibly be mitigated, that the Trustees' statement of overriding circumstances is invalid necessarily follows. CEQA does not authorize an agency to proceed with a project that will have significant, unmitigated effects on the environment, based simply on a weighing of those effects against the project's benefits, unless the measures

necessary to mitigate those effects are truly infeasible. Such a rule, even were it not wholly inconsistent with the relevant statute (*id.*, § 21081, subd. (b)), would tend to displace the fundamental obligation of "[e]ach public agency [to] mitigate or avoid the significant effects on the environment of projects that it carries out or approves whenever it is feasible to do so" (*id.*, § 21002.1, subd. (b)). This conclusion does not, however, preclude the Trustees from including in a revised EIR a statement of overriding considerations regarding environmental effects as to which they have properly found mitigation to be infeasible for reasons other than those we have rejected.

### III. CONCLUSION

From the foregoing discussion it follows that the Trustees must be directed to vacate their actions certifying the EIR and approving the Master Plan and set aside the EIR's statement of overriding circumstances. The superior court's writ of mandate does order such relief. The writ is, however, incorrect in one respect. In describing the principles that would apply should the Trustees decide to make voluntary mitigation payments to FORA, the court wrote that "CSUMB's proportional share of the cumulative impacts on public capital facilities in the region necessary to mitigate the significant adverse environmental impacts of the CMP *shall be determined by [FORA]* . . . ." (Italics added.) To the contrary, having chosen not to assess the campus but instead to rely on the Trustees to comply with their CEQA obligation to mitigate or avoid the environmental effects of their project, FORA has no power to dictate the manner in which the Trustees exercise their discretion. Neither do the remedial provisions of CEQA "authorize[s] a court to direct any public agency to exercise its discretion in any particular way." (Pub. Resources Code, § 21168.9, subd. (c).) CEQA requires only that any mitigation measures the Trustees adopt be adequate. If FORA wishes to compel the Trustees to contribute a specific amount to infrastructure improvement projects, FORA is free to proceed by exercising the powers specifically granted in the FORA Act (e.g., Gov. Code, § 67679, subd. (d)), and in the public financing statutes to which the act refers (*ibid.*), to impose a formal assessment on the CSUMB campus, complying of course with the procedural requirements set out in those statutes and in the California Constitution (e.g., art. XIII D, § 1 et seq.).

### IV. DISPOSITION

The judgment of the Court of Appeal is reversed and the cause remanded to that court with directions to order the superior court to vacate its writ of mandate and to issue a new writ consistent with the views set forth in this opinion.

George, C. J., Kennard, J., Baxter, J., Moreno, J., and Corrigan, J., concurred.

**CHIN, J.,** Concurring.—I concur in the judgment and in most of the majority opinion's reasoning. I write separately to explain my reasons for agreeing that the Board of Trustees of the California State University (Trustees) may not rely on Public Resources Code section 21081, subdivision (a)(2),[1] and to express concern about the majority's discussion of this issue.

Under the California Environmental Quality Act (CEQA) (§ 21000 et seq.), when a certified environmental impact report identifies significant environmental effects of a proposed project, section 21081, subdivision (a)(2), permits a public agency to approve or carry out the project if it finds that "changes or alterations" in the project that would mitigate or avoid the identified environmental effects "are within the responsibility and jurisdiction of another public agency and have been, or can and should be, adopted by that other agency." The Trustees, who made such a finding here, argue that this provision applies because, under the Fort Ord Reuse Authority Act (Gov. Code, § 67650 et seq.) (FORA Act), the Fort Ord Reuse Authority (FORA) has "*exclusive* authority to plan and construct off-campus local infrastructure improvements" and "the University *lacks jurisdiction . . .* to build off-site improvements."

In my view, the Trustees err by focusing on the wrong question: Whether the Trustees, acting for the California State University (CSU), have any responsibility and jurisdiction regarding actual construction of the necessary off-campus infrastructure improvements. The particular mitigation measure at issue here—i.e., the proposed "change[] or alteration[]" in the project to mitigate or avoid the identified environmental effects (§ 21081, subd. (a)(2))—is not actual construction of the improvements, but is payment to FORA to help fund the improvements FORA intends to construct. Thus, the relevant question here in applying section 21081, subdivision (a)(2), is not, as the Trustees argue, whether they have jurisdiction actually "to build off-site improvements," but is whether they have any responsibility and jurisdiction to help fund FORA's construction of those improvements.

Based on provisions of the FORA Act and the Education Code, I conclude that the Trustees have such responsibility and jurisdiction. Regarding the former, the FORA Act declares the "financing . . . of the reuse of Fort Ord" to be "a matter of statewide importance." (Gov. Code, § 67657, subd. (c).) It provides that FORA's Fort Ord reuse plan "shall be the official local plan for the reuse of the base for all public purposes, including . . . *funding by all state agencies*." (Gov. Code, § 67675, subd. (a), italics added.) It directs FORA to "arrang[e] for the[] financing" of—not to finance itself—"basewide public capital facilities" such as "roads." (*Id.*, § 67679, subd. (a)(1).) It also

---

[1] All further unlabeled statutory references are to the Public Resources Code.

authorizes FORA to "seek state and federal grants and loans or other assistance to help fund public facilities" (*id.*, § 67679, subd. (c)), and to "enter into contracts and agreements as necessary to mitigate impacts of the reuse of Fort Ord." (*Id.*, § 67680.5.) These provisions demonstrate the Legislature's intent that funding of the necessary infrastructure improvements not be solely FORA's responsibility, and that funding be provided, at least in part, by other public agencies.

Several provisions of the Education Code also are relevant to the Trustees' responsibility and jurisdiction. The Education Code declares generally that "[t]he mission of the public segments of higher education . . . include[s] a broad responsibility to the public interest." (Ed. Code, § 66010.5.) Of course, payments to FORA to help mitigate significant environmental impacts of the expansion project here at issue would serve the public interest. The Education Code also declares "the intent of the Governor and the Legislature, in cooperation with the Trustees," to "[p]lace a major priority on resolving the serious problem of impacted and overcrowded classes, not only with respect to the [CSU], but throughout public postsecondary education." (*Id.*, § 66015, subd. (a).) Consistent with this declared priority, the Education Code imposes on the CSU a duty "to plan that adequate spaces are available to accommodate all California resident students who are eligible and likely to apply to attend an appropriate place within the system." (*Id.*, § 66202.5.) It also grants the Trustees "full power and responsibility in the construction and development of any state university campus, and any buildings or other facilities or improvements connected with the [CSU]." (*Id.*, § 66606.) Finally, it directs the Trustees to "expend all money appropriated for the support and maintenance of the [CSU]" (*id.*, § 89750), and authorizes them to "enter into agreements with any public or private agency, officer, person, or institution, corporation, association, or foundation for the performance of acts or for the furnishing of services, facilities, materials, goods, supplies, or equipment by or for the trustees or for the joint performance of an act or function or the joint furnishing of services and facilities by the trustees and the other party to the agreement." (*Id.*, § 89036, subd. (a).) Based on these provisions, I have no trouble concluding that the Trustees have both responsibility and jurisdiction within the meaning of Public Resources Code section 21081, subdivision (a)(2), to contribute to the cost of off-site infrastructure improvements needed to mitigate significant environmental impacts of an expansion project designed, in part, to address the statutorily declared "priority on resolving the serious problem of impacted and overcrowded classes, not only with respect to the [CSU], but throughout public postsecondary education."[2] (Ed. Code, § 66015, subd. (a).)

---

[2] As the majority notes, the Trustees cited this problem in a statement of overriding considerations to justify their approval of the project despite unmitigated environmental effects. (Maj. opn., *ante*, at p. 354.)

I do not join the majority's analysis of this issue insofar as it relies on several CEQA provisions to find that the Trustees have jurisdiction and responsibility within the meaning of section 21081, subdivision (a)(2). (Maj. opn., *ante*, at pp. 366–367.) The majority cites section 21002.1, subdivision (b), which requires "[e]ach public agency [to] mitigate or avoid the significant effects on the environment of projects that it carries out or approves whenever it is feasible to do so," and section 21106, which requires " '[a]ll state agencies . . . [to] request in their budgets the funds necessary to protect the environment in relation to problems caused by their activities.' " (Maj. opn., *ante*, at p 367.) Because these two CEQA statutes apply to every state agency, the majority's analysis substantially limits the circumstances under which a state agency may invoke section 21081, subdivision (a)(2). It is unclear to me the Legislature intended section 21081, subdivision (a)(2), to be read so narrowly. Because my analysis depends on non-CEQA provisions, I need not, and do not, address that question.

I also do not join the majority's analysis insofar as it appears to suggest that a public agency lacks jurisdiction and responsibility within the meaning of section 21081, subdivision (a)(2), when "the Legislature does not appropriate" money requested to pay for mitigation measures. (Maj. opn., *ante*, at p. 367.) To begin with, the discussion is dictum. As the majority notes, there is no evidence here the Trustees have even asked the Legislature for the necessary funds. (Maj. opn., *ante*, at p. 367.) Thus, it is both unnecessary and premature to express an opinion about whether the Legislature's denial of a funding request would affect the Trustees' jurisdiction and responsibility for purposes of applying section 21081, subdivision (a)(2).

The other reason I do not join the majority's dictum is that I question its soundness. It is not clear to me that, for purposes of applying section 21081, subdivision (a)(2), a public agency has no responsibility or jurisdiction for a mitigation measure simply because the Legislature denies a specific request for money to pay for that mitigation measure. Here, for example, even were the Legislature to reject such a request, arguably, the Trustees would still have responsibility and jurisdiction to contribute to FORA with money from the CSU's general operating fund. Moreover, the Legislature has expressly authorized the Trustees, at their discretion and "without the prior approval of any other state department or agency," to "sell improvements located on the land at the . . . Monterey Bay campus that was transferred" from the federal government (Ed. Code, § 89010, subd. (a)) and to use proceeds from those sales "for the purposes of building, maintaining, and funding a campus . . . at Monterey Bay through expenditures for improvements to the campus . . . ." (*Id.*, § 89010, subd. (b).) Arguably, by virtue of these provisions, even were the Trustees to make, and the Legislature to reject, a specific appropriation request regarding the off-campus improvements here at issue, the Trustees

would have "the power" to make contributions to FORA for those improvements (maj. opn., *ante*, at p. 367) and would have jurisdiction and responsibility within the meaning of section 21081, subdivision (a)(2), to make such contributions. Because of these substantive doubts, because we need not decide the question here, and because we have no briefing on the question, I decline to join the majority's dictum.