Filed 12/11/23  Habitat and Watershed Caretakers v. Regents of the University of California CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| HABITAT AND WATERSHED CARETAKERS et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al., <br><br> Defendants and Respondents; <br><br> CAPSTONE DEVELOPMENT PARTNERS, LLC et al., <br><br> Real Parties in Interest. | H050745 <br> (Santa Cruz County <br> Super. Ct. No. 21CV01022) |

This appeal marks the latest challenge to efforts by the University of California, Santa Cruz (University) to expand student housing on its Santa Cruz campus.

Appellants Habitat and Watershed Caretakers, Don Stevens, Russell B. Weisz, Harry D. Huskey and Peter L. Scott (collectively, appellants) challenge the approval of Student Housing West (the project) by the Regents of the University of California (Regents).  The project includes the construction of family student housing on an undeveloped portion of the UC Santa Cruz campus known as the East Meadow.

Appellants filed a petition for writ of mandate asserting, among other claims, that the Regents' approval of the project violated the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.[1]). Appellants alleged the Regents failed to evaluate new evidence introduced during the approval process concerning the project's feasible alternatives, benefits, and impacts. The trial court rejected appellants' CEQA-based arguments, found that substantial evidence in the administrative record supported the Regents' approval decision, and denied appellants' writ petition.

In this court, appellants contend that the Regents violated CEQA by: (1) ignoring evidence that the project benefits were overstated due to the high cost of the proposed housing; (2) assuming the efficacy of mitigation measures that in fact will not prevent significant impacts to soil and water quality; and (3) disregarding a feasible off-campus alternative in the City of Marina that could provide student housing and reduce the project's significant environmental impacts.

For the reasons explained below, we reject appellants' contentions and affirm the trial court's order and judgment denying the writ of mandate.

## I. FACTS AND PROCEDURAL BACKGROUND

*A. Project Background: Student Housing West*

In 2006, the Regents approved the 2005 Long Range Development Plan (2005 Plan) for the University and certified the related 2005 Plan Environmental Impact Report (2005 Plan EIR). The 2005 Plan generally provided "a comprehensive framework for the physical development of the UC Santa Cruz campus." It called for a significant expansion of the University's student population and for the construction of additional buildings. It included a building program to accommodate the projected campus

---

[1] Unspecified statutory references are to CEQA provisions as codified in the Public Resources Code. Where applicable, the State CEQA guidelines (Cal. Code Regs., tit. 14, §§ 15000–15387) will be noted as "Guidelines" to distinguish between the Public Resources Code and the Code of Regulations.

development, described a land use plan that identified allowable areas for potential development and areas designated for preservation, and assigned land use categories and related objectives to all campus lands.

Several parties, including appellants, challenged the 2005 Plan EIR under CEQA. Those lawsuits were consolidated and adjudicated. Ultimately, the lawsuits were resolved in a 2008 Comprehensive Settlement Agreement (2008 Agreement). Appellants are signatories to the 2008 Agreement.

The 2008 Agreement imposed limits on the campus growth envisioned by the 2005 Plan. For example, the 2008 Agreement capped undergraduate enrollment to 17,500 full-time equivalent students "[f]or as long as the 2005 [Plan] is in effect." It required the University to provide housing at a capacity of 7,125 beds for enrollment levels up to 15,000. It also mandated "that the next major amendment" to the 2005 Plan "include a comprehensive analysis of potentially feasible alternative locations to accommodate proposed UC [Santa Cruz] enrollment growth beyond that analyzed in the 2005 [Plan] EIR."

The project at issue in this appeal seeks to implement the University's objectives for new housing as set forth in the 2005 Plan and the 2008 Agreement. The project is designed to house approximately 3,100 students across two sites, the "Heller site" and the "Hagar site." The Regents seek to "address unmet demand for on-campus housing by current" students, "reduce density in existing on-campus housing to provide more appropriate student living spaces," "replace obsolete student family housing," and help the University "meet the requirements of the 2008" Agreement and "enroll 19,500 students in accordance with the 2005" Plan.[2]

---

[2] Appellants assert these objectives are inconsistent with the University's housing studies and with aspects of the 2005 Plan and the 2008 Agreement, but concede those issues are outside the scope of the present appeal.

The development plan for the 13-acre Heller site, located near the west entrance to the campus at Heller Drive, provides for demolition of the existing 200-unit family student housing complex and childcare center. In its place, the University plans to construct six buildings, up to seven stories tall, accommodating 2,932 beds for undergraduate and graduate students (2,712 undergraduate student beds and 220 graduate student beds) as well as other student amenities and facilities.

The plan for the Hagar site converts 17 of 87 acres of undeveloped land in the southeast area of campus, known as the East Meadow, to family student housing. This conversion required an amendment to the 2005 Plan to redesignate the land for the Hagar site from campus resource land (i.e., undeveloped land) to colleges and student housing. The Regents approved the required amendment to the 2005 Plan in connection with their initial approval of the 2019 project, discussed in more detail *post*.

The plan for the Hagar site calls for the construction of approximately 35 two-story townhouses for students with families (serving 140 students and their 280 dependents), an early education/childcare center serving children of University students and employees, and other infrastructure.

*B. 2019 Project EIR Approval & Litigation*

In March 2018, the University published and circulated a draft project EIR (draft EIR), which was tiered from the program EIR prepared for the 2005 Plan. After an extended public comment period and multiple public meetings, the University determined that significant changes to the draft EIR were required to address design changes and additions, project alternatives, and public comments on impacts at the Hagar site. In September 2018, the University published a revised draft EIR (revised draft EIR), which replaced in full the draft EIR.

Following the public comment period and public meetings on the revised draft EIR, the University, as the lead agency pursuant to CEQA, prepared a final EIR for the housing project, which included revisions to the revised draft EIR and responses to

4

comments on the revised draft EIR (final EIR). In March 2019, the Regents certified the final EIR, adopted findings, issued a statement of overriding considerations, finalized the mitigation monitoring and reporting program for the project, and approved the project, including authorizing lease terms and financing for all three project phases (collectively, the "2019 project approvals").

Two lawsuits filed in the Santa Cruz County Superior Court challenged the 2019 project approvals.

In *East Meadow Action Committee v. Regents* (No. 19CV01312) (referred to by the parties and the trial court in this case as "*EMAC*"), the trial court upheld the Regents' certification of the final EIR but found that the Regents' alternatives analysis in the 2019 approvals process violated CEQA by relying solely on confidential cost data reviewed only by a three-person committee of the board. The court issued a writ directing the Regents to set aside the project's design approvals. The court directed the Regents, prior to reconsidering approval of the project, " 'to consider any information regarding the feasibility of alternatives, including economic information, and take such into account in reconsidering approval of the Student Housing West Project.' " On appeal, a panel of this court affirmed the judgment of the trial court granting in part and denying in part the East Meadow Action Committee's petition for writ of mandate. (*East Meadow Action Committee v. Regents of University of California* (Feb. 4, 2022, H048695) [nonpub. opn.] (*EMAC*).)

In the other lawsuit, *Stevens, et al. v. Regents* (No. 19CV03696), appellants and others alleged that the 2019 project approvals and amendment to the 2005 Plan to change the land use designation for the Hagar site violated the parties' 2008 Agreement. The trial court rejected the *Stevens* plaintiffs' claims and entered judgment in the University's favor in May 2022. On appeal, a panel of this court affirmed the trial court's judgment. (*Stevens v. Regents of University of California* (July 28, 2023, H050230) [nonpub. opn.] (*Stevens*).)

5

*C. Reapproval Process and 2021 Project Approvals*

The writ of mandate in *EMAC* directed the Regents to set aside and reconsider the 2019 project design approvals and to ensure that any information regarding the feasibility of alternatives be provided to the full Board of Regents. The Regents reopened the public record to public comments on the project and reconsidered, in meetings held on March 17 and 18, 2021, the project design approval.[3] The staff report provided to the Regents for the March 17 meeting stated that CEQA does not require a formal comment period before the adoption of findings at this stage of CEQA review, the project design was unchanged from the design approved in 2019, and further environmental review is not required under section 21166 (governing subsequent or supplemental environmental review under CEQA after an environmental impact report has been prepared).

On March 16, appellants submitted written comments objecting to reapproval of the project. Appellants' March 16 comments referred to and incorporated as exhibits prior comments submitted at earlier stages of the approval process, as well as separate comments submitted by appellants on March 8 in response to the University's publication and circulation of the Draft EIR for the 2021 Long Range Development Plan (2021 Plan).[4] Appellants' comments on the 2021 Plan draft EIR attached expert analyses prepared, respectively, by real estate consultant Lewis Goodkin (Goodkin analysis) and by hydrogeologist Thomas Aley (Aley analysis). Appellants rely extensively on the

---

[3] Unless otherwise indicated, all dates were in 2021. The March 17 and 18 meetings consisted of separate meetings of the Finance and Capital Strategies Committee and the full Board of Regents.

[4] The 2021 Plan was developed to replace the 2005 Plan and to provide long term guidance over a 20-year horizon, through 2040. It projects an increase of student enrollment to 28,000 full-time equivalent students. Every long-range development plan must be accompanied by preparation of an EIR. (§ 21080.09, subd. (b).)

Goodkin and Aley analyses in this appeal.[5] We discuss the contents of each expert analysis in more detail where relevant to our analysis.

Appellants' March 16 comment letter criticized the project's "rapid housing growth" as unnecessary to meet the objectives of the 2008 Agreement. It argued the project violated the 2008 Agreement by seeking "to preemptively open the door to future growth on campus in excess of the [2008 Agreement]'s cap on undergraduate student enrollment of 17,500" and by failing to analyze potentially feasible alternative locations including satellite campuses and remote classrooms. Appellants generally argued that, without additional mitigation or explanation of how project impacts will be prevented, the determination set forth in the proposed findings and statement of overriding considerations reapproving the project violates CEQA. The March 16 comment letter did not directly cite the attached Goodkin or Aley analyses.

At the March 17 meeting of the Finance and Capital Strategies Committee, the Committee discussed concerns related to the design approval, rental costs, and alternatives to building the Hagar site. Comments by several Regents and the University Chancellor Cynthia Larive focused on housing affordability. They discussed whether the University was making a commitment to ensure that housing project rental rates would be at least 30 percent below market. Regent John Pérez questioned what the Committee had done between the 2019 approvals and the present to evaluate the financial information previously relied upon to reject the alternatives. Chancellor Larive stated that, while they would not know actual costs of the project until it goes out to bid, she would commit "to bring this project in at 30 percent below market" and was "pretty confident [they could] do that." The Committee voted 8 to 2 to approve the recommended project design and present it to the full Board.

---

[5] The Draft EIR for the 2021 Plan, dated January 2021, to which the Goodkin and Aley analyses are directed, is not at issue in this appeal.

7

On March 18, the Regents voted to set aside the 2019 project approvals and reconsider the project approvals in light of the information and public comments timely received. After additional discussion of the housing project and of the Chancellor's commitment that the University would provide rental rates at 30 percent below market, the Regents voted 16 to 3 to approve the project. Through its approval action, the Regents adopted the CEQA findings (findings) and statement of overriding considerations, adopted the mitigation monitoring and reporting program requiring the implementation of mitigation measures, and approved the design of the housing project (collectively, the "2021 project approvals").

This appeal challenges the findings and statement of overriding considerations contained in the 2021 project approvals. In support of their decision, the Regents found, with respect to potentially significant adverse impacts to geology and soils, that by implementing the identified mitigation measures the University can reduce those impacts to less-than-significant. As to those unavoidable impacts of the project identified in the final EIR, the Regents found that the project will cause significant and unavoidable impacts to the aesthetics and scenic resources at both the Heller and Hagar sites and to utilities and service systems because of increased water usage. The Regents found, based on the supplemental population and housing impact analysis of campus growth included in the final EIR, that the impacts of campus growth under the 2005 Agreement would result in a significant impact on housing in the City of Santa Cruz, including "significant and unavoidable traffic and water supply impacts."

The Regents found that the enumerated benefits of the project outweighed its significant unavoidable impacts. (See § 21081; Guidelines, § 15093.) The stated benefits included: Enabling the University to meet its housing commitments under the 2005 Plan to reduce density and overcrowding in existing on-campus housing and to "meet a portion of the additional demand for on-campus housing"; supporting University graduate students by constructing affordable graduate student housing and allowing the University

8

to increase the size of graduate programs; helping to ease the pressure of student demand on the greater local housing market; replacing existing family student housing "which is nearly 50 years old and at the end of its useful life" with family student housing and early education facilities separate from undergraduate and graduate housing; and enabling the University to provide employee childcare and contribute to faculty recruitment and retention. The Regents concluded that each of the benefits of the project "constitutes an overriding consideration warranting approval of the [p]roject, independent of the other benefits, despite each and every unavoidable impact."

With respect to alternatives, the Regents found that the final EIR analyzed a reasonable range of alternatives to the project and addressed in the responses to comments other alternatives proposed by members of the public. The findings rejected each of the seven alternatives addressed in the final EIR on a variety of grounds, including that the alternative was infeasible, would increase the project's per-bed costs and rental rates, would exacerbate issues such as overcrowded student housing, or would implicate other social and economic considerations related to housing supply in the Santa Cruz area and availability and affordability of housing.

### D. Petition for Writ of Mandate and Present Appeal

In April 2021, appellants filed this action challenging the 2021 project approvals. The petition for writ of mandate and complaint (petition) asserts three causes of action for (1) violations under CEQA, (2) breach of contract based on the 2008 Agreement, and (3) mandamus based on alleged violations of the Regents' duties under CEQA and the 2008 Agreement.

Only the CEQA-based claims are at issue in this appeal. As to those claims, appellants assert that the Regents failed to proceed in the manner required by CEQA in making the findings and evaluating overriding considerations, which they contend are not supported by substantial evidence in the record. The petition seeks a peremptory writ of mandate requiring the Regents to set aside the 2021 project approvals; a judicial

9

declaration that the 2021 project approvals are invalid under CEQA and are subject to (and in violation of) the 2008 Agreement; and other remedies, including injunctive relief.

In October 2022, the trial court issued its final ruling and statement of decision, denying appellants' claims (final ruling).[6] The court thereafter entered judgment in favor of the Regents on all causes of action.

Appellants timely appealed the judgment denying the petition.

## II. DISCUSSION

Appellants challenge the Regents' 2021 project approvals. In particular, appellants identify the following alleged deficiencies in the Regents' findings and statement of overriding considerations: First, that the statement presumes benefits related to the provision of housing despite evidence showing that high rental rates for the project will result in a high vacancy rate and undermine the claimed benefits; second, that the Regents' findings presume that significant impacts to soils and water quality will be reduced to insignificant, despite unaddressed evidence that construction of the Hagar site over a known karst formation[7] will cause dangerous instability and groundwater

---

[6] Appellants appeal the trial court's decision under CEQA. They do not challenge other aspects of the trial court's final ruling, including its determination that the petition claims related to the 2008 Agreement were "identical" to the claims raised in the *Stevens* litigation. (Prior to the trial court's ruling, the parties in this matter stipulated that the result in *Stevens* would be dispositive of the same issues in this case.) As noted *ante*, a panel of this court affirmed the trial court's judgment in *Stevens*. (*Stevens*, *supra*, H050230.)

[7] According to the revised draft EIR, the Hagar site "is located within areas designated Karst Hazard Levels 3 and 4 in the Campus's 2005 geology and geologic hazards study, which respectively have moderate and high potentials of being affected by karst-related hazards." "Karst" refers to "[a] kind of topography . . . found in areas of readily dissolved rock (usually limestone) and predominantly underground drainage and marked by numerous abrupt ridges, fissures, sink-holes, and caverns." (Oxford English Dict. Online, <https://www.oed.com/dictionary/karst_n?tab=meaning_and_use#40312105> [as of Dec. 5, 2023], archived at: <https://perma.cc/U6GH-9ZWZ>.) We take judicial notice of the dictionary definition of karst. (See Evid. Code, §§ 452, subd. (h), 459, subd. (a).)

10

degradation; and lastly, that the Regents have erroneously concluded that all feasible alternatives that can substantially reduce the project's significant impacts have been addressed when, in fact, the findings fail to consider the University's satellite campus in Marina as a feasible, alternative project site.

In response, the Regents contend that the findings and statement of overriding considerations fully comply with CEQA and are supported by substantial evidence. The Regents also argue that to the extent appellants appear to challenge the adequacy of the final EIR, or suggest the Regents needed to conduct additional environmental review before adopting the 2021 project approvals, those arguments fall outside the scope of review in this court.

We address each of the three issues raised by appellants, beginning with an overview of the principles and standards of review that guide our analysis.

*A. Governing Legal Principles*

"With narrow exceptions, CEQA requires an EIR whenever a public agency proposes to approve or to carry out a project that may have a significant effect on the environment." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 390 (*Laurel Heights I*); see Guidelines, § 15002, subd. (f)(1).) Before an agency can approve or carry out a project for which an EIR has been certified that identifies one or more significant effects on the environment, the agency must make specified findings with respect to each significant effect on the environment. (§ 21081, subd. (a).)

If mitigation or an alternative to the significant impact is infeasible, the agency must find "that specific overriding economic, legal, social, technological, or other benefits of the project outweigh the significant effects on the environment" before it can approve or carry out the project. (§ 21081, subd. (b); *City of Marina v. Board of Trustees of California State University* (2006) 39 Cal.4th 341, 350 (*City of Marina*).) This express written finding, known as a statement of overriding considerations, allows the agency "to

11

balance, as applicable, the economic, legal, social, technological, or other benefits, . . . of a proposed project against its unavoidable environmental risks when determining whether to approve the project" and to decide that the project's benefits outweigh any significant impact. (Guidelines, § 15093, subd. (a).) The statement of overriding considerations must be supported by substantial evidence in the record. (*Id*., subd. (b).)

An agency may not approve a proposed project if feasible alternatives or mitigation measures would substantially lessen the proposed project's significant environmental effects. (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 565; see § 21002; Guidelines, § 15092.) On the other hand, CEQA "does not necessarily call for disapproval of a project having a significant environmental impact, nor does it require selection of the alternative 'most protective of the environmental status quo.' [Citation.] Instead, when 'economic, social, or other conditions' make alternatives and mitigation measures 'infeasible,' a project may be approved despite its significant environmental effects if the lead agency adopts a statement of overriding considerations and finds the benefits of the project outweigh the potential environmental damage." (*California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 383, citing §§ 21002, 21002.1, subd. (c); Guidelines, § 15093.)

A statement of overriding considerations complies with CEQA "only when the measures necessary to mitigate or avoid those effects have properly been found to be infeasible." (*City of Marina*, *supra*, 39 Cal.4th at p. 368.) The statement is not a substitute for an agency's infeasibility findings but rather " 'supplements those findings and supports an agency's determination to proceed with a project despite adverse environmental effects.' " (*California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 983.) "It 'is intended to demonstrate the balance struck by the body in weighing the "benefits of a proposed project against its unavoidable environmental risks." (Guidelines, § 15093, subds. (a) and (c).)' " (*Ibid.*)

12

Thus, "the statement of overriding considerations focuses on the larger, more general reasons for approving the project, such as the need to create new jobs, provide housing, generate taxes, and the like." (*Concerned Citizens of South Central L.A. v. Los Angeles Unified School Dist.* (1994) 24 Cal.App.4th 826, 847 (*Concerned Citizens*).) These considerations place an agency's decision that specific project benefits outweigh any environmental effects that cannot feasibly be mitigated "at the core of the lead agency's discretionary responsibility under CEQA." (*City of Marina*, *supra*, 39 Cal.4th at p. 368.) While we review the statement for abuse of discretion (§ 21168.5), the override determination is "not lightly to be overturned." (*City of Marina*, at p. 368.)

### B.  Scope and Standard of Review

The parties agree that the adequacy of the final EIR, certified in 2019, is not at issue in this appeal. The narrow issue presented here is whether the University had a duty to address new evidence presented during the 2021 reapproval proceedings regarding the affordability of housing and other significant impacts of the project.

We review the Regents' compliance with CEQA in adopting the 2021 project approvals for abuse of discretion. (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 512 (*Sierra Club*).) "Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (§ 21168.5.) In making this determination, we review the agency's action, not the trial court's decision. (*Protecting Our Water & Environmental Resources v. County of Stanislaus* (2020) 10 Cal.5th 479, 495 (*Protecting Our Water*); *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427 (*Vineyard*).) We must "independently determine[] whether the record 'demonstrates any legal error' by the agency and deferentially consider[] whether the record 'contains substantial evidence to support [the agency's] factual determinations.' " (*Protecting Our Water*, at p. 495.) We review an agency's decision

13

based on factual considerations for substantial evidence and review de novo an agency's determination involving " 'pure questions of law.' " (*Ibid.*)

The parties dispute the degree of deference we must afford to the Regents' findings and statement of overriding considerations. Appellants characterize the asserted errors as legal/procedural in nature, requiring de novo review. Appellants contend the Regents "completely fail[ed] to address" (italics omitted) the evidence and argument presented during the reapproval proceedings and "omit[ted] findings on key issues essential to [the Regents'] informed review of the [p]roject and to the public's understanding of the basis for its approval." Appellants argue that in this case, the agency "*omitted* essential environmental review" resulting in an "informational void" and demonstrating noncompliance with CEQA's substantive requirements and information disclosure provisions.

The Regents maintain that our review is limited to considering whether substantial evidence in the record supports the findings and statement of overriding considerations. They point out that most of the cases cited by appellants to support their position, including *Sierra Club* and *County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931 (*County of Amador*), concern EIRs and do not address judicial review of CEQA findings or statements of overriding considerations.

It is true that case authority examining the procedural/factual dichotomy with respect to the applicable CEQA standard of review largely arises in the context of legal challenges to the adequacy of an EIR. (See, e.g., *Sierra Club*, *supra*, 6 Cal.5th at pp. 513–515; *County of Amador*, *supra*, 76 Cal.App.4th at pp. 945–946.) Nevertheless, the statutory standard for prejudicial abuse of discretion does not vary based on whether the alleged error pertains to the adequacy of the EIR or, as here, to the agency's later-stage findings. (§ 21168.5.) We therefore decide that the same principles guide our review of the Regents' findings and statement of overriding considerations as would apply to our review of the certification of an EIR. We must "adjust [our] scrutiny to the

14

nature of the alleged defect, depending on whether the claim is predominantly one of improper procedure or a dispute over the facts." (*Vineyard*, *supra*, 40 Cal.4th at p. 435; accord *Sierra Club*, at p. 512.)

We independently review the adequacy of the Regents' findings and statement of overriding considerations with respect to their alleged failure to include evidence introduced during the 2021 project approval process concerning project benefits, impacts, and feasible alternatives. (See *Sierra Club*, *supra*, 6 Cal.5th at p. 516.) To the extent that appellants' claims implicate predominantly factual questions, such as whether the Regents' findings on mitigation measures at the Hagar site adequately address the significant impacts to soil and groundwater, we defer to the agency's substantive factual determination. (*Ibid*.; *Vineyard*, *supra*, 40 Cal.4th at p. 435; accord *Protecting Our Water*, *supra*, 10 Cal.5th at p. 495.) In reviewing the record for substantial evidence, we "resolve reasonable doubts in favor of the administrative decision" (*County of Amador*, *supra*, 76 Cal.App.4th at p. 945) and do "not set aside an agency's determination on the ground that the opposite conclusion would have been equally or more reasonable." (*Id*. at pp. 945–946; *Vineyard*, at p. 435.)

*C. Analysis*

Appellants' overarching complaint is that the 2021 project approvals, findings, and statement of overriding considerations fail to comply with CEQA's procedural and substantive requirements for approving a project. While appellants identify numerous ways in which they claim the University's environmental review falls short of CEQA's mandates, we focus our discussion on the three discrete issues that appellants advance as grounds for reversal.

1.  Project Affordability and Benefits

Appellants contend that by omitting any discussion of analyses of housing affordability, rental rates, and demand from its findings and statement of overriding considerations, the Regents committed legal error under CEQA. (*Vineyard*, *supra*, 40

15

Cal.4th at p. 435). Appellants argue that without express findings on the affordability of the proposed housing units, neither the public nor a reviewing court can discern the basis for the project's approval. In particular, appellants maintain that the Regents erred by adopting the 2021 project approvals without addressing evidence in the public record, namely the evidence summarized in the Goodkin analysis.

The Goodkin analysis addressed the 2021 Plan draft EIR's discussion of impacts on population and housing demand. Goodkin reviewed his findings from a prior study he conducted in relation to the proposed housing project, as well as data relied on by the University (including from the Campus Community Rentals Office, the April 2018 Student Housing Demand Analysis by Brailsford & Dunlavey, and a December 2018 Brailsford & Dunlavey Memorandum). He concluded that the University's demand analysis "had serious flaws and grossly overestimated the potential demand for [Student Housing West] units due in part to the rental price disparity between SHW units and off-campus housing." Goodkin opined that the University had failed to recognize "that the price of student housing is so high relative to the price of off-campus housing that the occupancy of the new student housing units will fall far short of the [University's] projections, causing a large percentage of the new students to seek housing off-campus."

We reject appellants' contention that the Regents' failure to expressly address the opinions set forth in the Goodkin analysis submitted during the public comment period for the reapproval decision constitutes legal or procedural error under CEQA. Appellants do not identify any statutory provision or Guidelines section that mandated the Regents, in their written findings, specifically respond to new public comments received at the project approval stage following an unsuccessful legal challenge to the certified final EIR.

The public notice and comment provisions applicable to agency preparation of an EIR or negative declaration (see § 21092; Guidelines, § 15088, subd. (c); *Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1124

16

(*Laurel Heights II*)) appear to have no comparable requirement for a standalone project approval. Nor do the notice and public review requirements applicable to a subsequent EIR or negative declaration apply.[8] (See Guidelines, §§ 15162, subd. (d), 15163, subd. (c).)

Instead of pointing to specific statutory or Guidelines authority, appellants rely on the overall CEQA objective of ensuring agency consideration of a project's significant effects, feasible mitigation strategies, and alternatives. They assert that the Regents had a duty under the Guidelines "to adopt written findings and a statement of overriding considerations that address the specific impacts, alternatives and mitigation measures" that they raised. However, CEQA's findings and approval requirements are firmly tied to the EIR. The agency must briefly explain its rationale for changes or alterations to the project that avoid or reduce the "significant environmental effect *as identified in the final EIR*" (Guidelines, § 15091, subd. (a)(1), italics added) and/or find that economic or "other considerations . . . make infeasible the mitigation measures or project alternatives *identified in the final EIR*" (*id.*, subd. (a)(3), italics added). We see no such requirement to expressly include considerations raised *after* certification of the final EIR.

Cases have similarly concluded that CEQA "does not suggest and there is no basis to conclude that before adopting a statement of overriding considerations an agency must consider additional mitigation measures and project alternatives apart from those identified in an adequate EIR." (*Federation of Hillside & Canyon Assns. v. City of Los Angeles* (2004) 126 Cal.App.4th 1180, 1201; see *A Local & Regional Monitor v. City of Los Angeles* (1993) 12 Cal.App.4th 1773, 1808 (*ALARM*) [noting " 'there is no requirement that an agency respond in writing to comments submitted' " outside of the EIR comment period].) Thus, to the extent appellants contend the Regents' failure to address "new expert evidence" (i.e., the Goodkin analysis) in the findings and statement

[8] Appellants maintain that section 21166, concerning subsequent or supplemental EIRs, has no application in this case.

17

of overriding considerations independently, or in and of itself, violated CEQA, we reject that contention as unsupported by the law and applicable Guidelines.

We recognize that under appropriate circumstances, as here where the public agency has invited public comment regarding pending project approvals, new evidence may have probative value in considering whether substantial evidence supports the agency's statement of overriding considerations. In section 21081.5, CEQA specifically provides that in deciding that economic or other considerations render mitigation measures or alternatives identified in the EIR infeasible, "the public agency shall base its findings on substantial evidence in the record, a provision reflecting an understanding that the decisionmaking entity will not limit its review to matters set forth in the EIR, but will base its decision on evidence found anywhere in the record." (*Sierra Club v. County of Napa* (2004) 121 Cal.App.4th 1490, 1503, italics omitted.) The approval process requires the agency to "reveal[] to citizens the analytical process by which the public agency arrived at its decision." (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 134.) It imposes on the agency "the burden of affirmatively demonstrating that, notwithstanding a project's impact on the environment, the agency's approval of the proposed project followed meaningful consideration of alternatives and mitigation measures." (*Ibid.*; see Guidelines, §§ 15091, subd. (b), 15093, subd. (b).)

We have therefore considered whether the findings and statement of overriding considerations are deficient because their conclusions lack substantial evidence support in the record, taking into account evidence (like the Goodkin analysis) introduced after EIR certification. We conclude that, even if the evidence appellants rely on is of probative value, the Regents' findings and statement of overriding considerations are supported by substantial evidence.

The findings addressed the project's significant and unavoidable impacts on aesthetics and scenic resources at the Heller and Hagar sites, and on significant and unavoidable traffic and water supply impacts identified in the final EIR. The statement

18

of overriding considerations listed 10 benefits and stated that each benefit "constitutes an overriding consideration warranting approval of the [p]roject, independent of the other benefits, despite each and every unavoidable impact." With the exception of one benefit, which lists "constructing affordable graduate student housing units" as a means to support the University's graduate students and increase the size of its graduate programs, the remaining benefits are not directly premised on the project's housing affordability. The predominant factors that define the remaining nine benefits include reducing overcrowding in existing on-campus housing, reducing the excess density in the existing residential halls, helping to ease the pressure of student demand on the greater local housing market, providing opportunities for students to live on campus, and replacing the aged family student housing.[9]

---

[9] The 10 benefits listed in the statement of overriding considerations are as follows: "[1] The project will enable the Campus to meet its housing commitments under the 2008 Comprehensive Settlement Agreement, to reduce overcrowding in existing on campus housing, and to meet a portion of the additional demand for on-campus housing. [¶] [2] The [p]roject will enable the Campus to reduce the excess density in the existing residence halls and return former lounges and community spaces to their original use. [¶] [3] By constructing affordable graduate student housing units, the [p]roject will allow UC Santa Cruz to support its graduate students and thereby increase the size of its graduate programs. [¶] [4] The project will help to ease the pressure of student demand on the greater local housing market, by providing housing for those who add to the already high demand for housing in the city. [¶] [5] The [p]roject will replace the existing family student housing, which is nearly 50 years old and at the end of its useful life. [¶] [6] The [p]roject will provide opportunities for students to live on campus, near academic venues, libraries, support systems and fellow student[s], which increases student success and engagement with the University community. [¶] [7] The [p]roject will develop replacement family student housing and early education facilities separate from the [p]roject's undergraduate and graduate housing components to meet the unique needs of these programs. [¶] [8] The [p]roject will enable the Campus to provide employee child care, which will contribute to faculty recruitment and retention. [¶] [9] The [p]roject will develop a mix of housing unit types and amenities that conform to student preferences and sensitivities. [¶] [10] The [p]roject sets a new standard on campus for its approach to sustainability, including the use of treated wastewater for most non-potable uses and solar photovoltaics on all buildings."

Appellants nevertheless contend that substantial evidence in the record does not support these proclaimed benefits because all 10 project benefits depend on affordability "for the simple reason that if the units are not affordable, they will not be occupied." Appellants essentially maintain that the omitted evidence on affordability is crucial to the project's viability, which as a private-public partnership, requires occupancy for its financial survival, and without which it cannot achieve any of its stated benefits.

These arguments oversimplify the factors considered by the Regents. They fail to recognize substantial evidence in the record that supports the Regents' exercise of discretion in balancing the project's unavoidable significant impacts against its benefits. That the findings and statement of overriding considerations did not expressly address appellants' public comments or their expert's criticisms concerning affordability does not demonstrate that the Regents were unaware of the project's affordability challenges or failed to consider any of the underlying evidence on housing costs. To the contrary, the record of the March 17 and 18 meetings on the 2021 project approvals reflects a lengthy and robust discussion on the topic of affordability. Several Regents pressed the University's administration on the issue, asked about amending the project approvals to formally require housing to "be at 30 percent below market," and confirmed that if the business terms previously approved for the project had to change, those terms would be brought back to the Board of Regents for its consideration.

Appellants criticize the Chancellor's statement at the March 17 meeting that "[o]ur current student housing is well below market" as contrary to the evidence and misleading. They contend that if the findings and statement of overriding considerations had addressed their expert evidence, "then the Regents who openly questioned the need for and affordability of the [p]roject would have been able to point out this contradiction,

20

informing the debate and potentially leading to rejection of the [p]roject because it would not be affordable to most students." However, the Chancellor provided more context than appellants acknowledge. Specifically, the Chancellor stated that "current student housing is well below market, especially when you take into account that the university, our students, their utilities and other costs -- safety, student support -- is all provided. *It's not directly comparable to the rates that you find in the market*." (Italics added.)

The housing data that appellants cite as evidence of the disparity between off-campus and on-campus rental rates provides some support for the distinction drawn by the Regents, in that the "[w]eighted [a]verage [undergraduate] [r]ental [r]ate" per project bed of $1,563 cited in the Supplementary Campus Report and the self-reported "weighted average of $853 per month exclusive of utilities" are not directly comparable. The lower, self-reported off-campus rates are "due to the large number of students sharing a bedroom with one or more people."

The Regents' decision to adopt the statement of overriding considerations without a formal amendment to guarantee the 30 percent below-market commitment represents precisely the type of balancing of broader considerations and described benefits of a proposed project against its unavoidable environmental risks provided for by CEQA. (*City of Marina*, *supra*, 39 Cal.4th at p. 368; *Concerned Citizens*, *supra*, 24 Cal.App.4th at p. 847.) This decision "lies at the core of the lead agency's discretionary responsibility under CEQA and is, for that reason, not lightly to be overturned." (*City of Marina*, at p. 368.)

Furthermore, the extensive on-the-record discussion by the Regents did not take place in a vacuum. The staff report provided to the Regents for the March 17 evaluation of the 2021 project approvals summarized the public comments received prior to the proceedings, including those of appellants. With respect to comments questioning the need for the project and the cost of on-campus housing, the staff report noted that issues of "[h]ousing availability and affordability are economic and social issues that inform

21

policy decisions made by the Regents, but are not treated as significant effects on the environment." The staff report nevertheless indicated, citing the final EIR, that "although demand for on-campus housing has, at different times over the years, been lower and many students have preferred to live off campus, in recent years, due to both limited availability and high cost of off-campus housing, more students are seeking on-campus housing." This assessment finds support in the final EIR, which summarized "historical and recent occupancy rates for University-controlled housing" and found the "5-year average occupancy rate for student housing was 97 percent."

Even assuming, arguendo, that the Goodkin analysis accurately predicts that higher pricing for on-campus housing relative to off-campus housing will result in lower than projected project occupancy rates, that evidence neither negates nor eliminates the counterpoint evidence supporting each individual benefit.

Substantial evidence to support the Regents' conclusions "means enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (Guidelines, § 15384, subd. (a).) The project's stated objectives include addressing unmet demand for on-campus housing by current students, reducing density in existing on-campus housing, and replacing obsolete family student housing. The Regents had enough information based on the record to reasonably infer that the project would realize one or more of the stated benefits—particularly "to ease the pressure of student demand on the greater local housing market" or to "provide opportunities for students to live on campus, near academic venues, libraries, support systems and fellow student[s]." In reviewing the record for substantial evidence, we "resolve reasonable doubts in favor of the administrative decision" (*County of Amador*, *supra*, 76 Cal.App.4th at p. 945) and do "not set aside an agency's determination on the ground that the opposite conclusion would have been equally or more reasonable." (*Id.* at pp. 945–946; *Vineyard*, *supra*, 40 Cal.4th at p. 435.)

22

In conclusion, we decide substantial evidence in the record shows that the Regents were aware of students' sensitivity to housing costs, sought assurances from the University administration that the housing project would be affordable at a 30 percent below market rate, and ultimately exercised their discretion to balance the benefits of the project against its risks and issue a statement of overriding considerations. We perceive no legal error in the Regents' failure to specifically cite the Goodkin analysis and no abuse of discretion in the Regents' override determination, which necessarily rests on broader policy considerations than affordability alone. (See *Concerned Citizens*, *supra*, 24 Cal.App.4th at p. 847; *City of Marina*, *supra*, 39 Cal.4th at p. 368.)

2. <u>Geological/Groundwater Impacts</u>

Appellants contend that in adopting the findings and statement of overriding considerations, the Regents "assumed the efficacy of mitigations that would not prevent impacts" and ignored expert evidence, summarized in the Aley analysis, revealing that the proposed development of the Hagar site on geologically fragile karst formations was unsafe and could jeopardize the University's groundwater supply.

The Aley analysis consisted of a hydrogeologic review of the draft EIR for the 2021 Plan. It criticized the adequacy of the investigations conducted by the University on the karst aquifer underlying the Hagar site. Aley opined that the University failed to adequately address soil stability, the sufficiency of groundwater supply to meet University campus demands in dry weather conditions, and the risk of catastrophic sinkhole collapse and land subsidence if limited water availability were to result in the pumping of aquifer supplies. Appellants claim that the Aley analysis shows several of the adopted mitigation measures "depend on wishful thinking or are triggered only after adverse impacts occur," while mitigations that would require advance geologic investigations before excavation begins "are not even considered." Appellants contend that the findings erroneously presume certain significant project impacts cannot be avoided or reduced to insignificance despite the availability of feasible mitigations.

23

Our limited scope of review requires us to reject appellants' contentions to the extent they rest on any claimed inadequacy of the final EIR's evaluation of mitigation measures. Although appellants deny they are challenging the discussion of project impacts and mitigation measures in the final EIR, and instead maintain they are directing their challenge exclusively at the findings and statement of overriding considerations, we disagree with this characterization of their arguments.

Fundamentally, appellants challenge the adequacy and feasibility of geologic and hydrologic mitigation measures GEO3-A and GEO3-B (HYD-3) in the final EIR. They contend that the mitigation measures "are either too vague or too narrow to be enforceable and effective, or [] simply fail to prevent impacts in the first place" and are consequently "insufficient to pass CEQA muster." They similarly argue that hydrological mitigation measures HYD-3A, HYD-3B, and HYD-3C are triggered only *after* environmental damage has occurred and thus do not effectively mitigate environmental degradation under CEQA. Appellants' arguments speak directly to the adequacy of the mitigation measures discussed in the certified final EIR. In fact, appellants' arguments closely mirror comments received on these same topics during the public comments period following the University's publication of the revised draft EIR.

For example, detailed comments submitted in November 2018 by the East Meadow Action Committee to the revised draft EIR for the housing project stated, among other concerns, that "the karst geology of these sites, particularly the Hagar/East Meadow site, is a major risk to development." The comments by EMAC questioned the stability of the karst formations underlying the Hagar site and cited the risk of underground voids in the course of construction, sinkholes, and impacts on the area's hydrology. EMAC specifically criticized the spacing of test borings conducted in the East Meadow as inadequate (stating that the borings "work[] out to an average of over 100 ft between borings, nowhere near enough borings to determine absence of voids over 10 ft") and

24

described the mitigation proposed in the draft project EIR as "vague, speculative, and unreassuring."

Appellants advance several of the same points in their reply brief. They dispute the University's claim that it performed adequate geophysical mapping and surveys to guide the location of the excavations for the project and argue, for example, that the exploratory boring program conducted over the Hagar site was "grossly inadequate to guide the design of the [p]roject's footprint."

This example illustrates that, contrary to appellants' claim that the Aley analysis presented entirely "new evidence" revealing the risks that accompanied development on top of unstable karst formations, substantially similar information was presented to the University during the environmental review process. The final EIR addressed the comments[10] and identified mitigation measures. We conclude that appellants' challenge to the Regents' findings on mitigation measures GEO-3A and GEO-3B is not cognizable to the extent it merely repeats prior arguments challenging the adequacy of the mitigation measures discussion ultimately certified in the final EIR.

Appellants contend that the University had a duty, mandated by Guidelines sections 15091 and 15093, to address the "new evidence" of the hazards posed by the proposed construction of the Hagar portion of the project over karst topography in the findings and statement of overriding considerations. But much of the Aley analysis does not contain new information that was not available or considered at the EIR stage. Also,

---

[10] For example, the final EIR acknowledged the risks and impacts of developing the project on karst formations, stating "there is always uncertainty built into development on karst terrane, similar to the inherent uncertainty that exists for the intersection of development and all geological processes, such as seismic shaking, surface fault rupture, coastal bluff erosion, etc. The investigative methods employed for this project are standard of practice for karst terrane development projects and are intended to provide recommendations that will result in acceptable risk levels for the different types of development. It is our understanding that no buildings on the campus have been negatively impacted by karst processes where the aforementioned methods employed by the design team have been applied."

as explained *ante*, CEQA does not expressly require that an agency respond in writing to comments submitted outside of the EIR comment period.  (*ALARM*, *supra*, 12 Cal.App.4th at p. 1808.)  This point is especially apt where the information in question, while appended to comments on the project approval proceedings at issue, was developed in relation to a different EIR (here, the draft EIR for the 2021 Plan) and not necessarily in response to the specific mitigation measures identified in the final EIR and analyzed in the Regents' findings.

Appellants' reliance on case authority addressing evidence of environmental impact discovered after EIR certification do not convince us otherwise.  Appellants cite *Mira Monte Homeowners Assn. v. County of Ventura* (1985) 165 Cal.App.3d 357 (*Mira Monte*) and *Save Berkeley's Neighborhoods v. Regents of University of California* (2020) 51 Cal.App.5th 226, as well as *Security Environmental Systems, Inc. v. South Coast Air Quality Management Dist.* (1991) 229 Cal.App.3d 110, in support of their argument that CEQA requires an agency to consider new information on project impacts even after certification of a final EIR and does not absolve the agency of its duty on the assumption the public "should have ferreted out" information the agency itself had failed to adequately disclose.

These cases do not assist appellants.  In *Mira Monte*, the appellate court reversed the denial of a writ of mandate after determining the lead agency abused its discretion under CEQA by certifying a project EIR and approving a project despite having learned, shortly before the hearing on certification, that a key assumption of the EIR (that the residential development would not physically invade wetland habitat) was incorrect. (*Mira Monte*, *supra*, 165 Cal.App.3d at pp. 360–362.)  The court held that the discovery that the proposed development would pave over part of the wetlands and effect a previously unanalyzed significant impact was a change of circumstances requiring further environmental review under section 21166.  (*Id*. at p. 365.)

26

Like *Mira Monte,* the other cases cited by appellants address the need for supplemental or additional environmental review (in the form of a subsequent EIR or tiered project level EIR) when changes arise with potentially significant environmental impacts that were not previously considered in the certified EIR. They do not support appellants' position here, which purports to deny raising any issues that warrant separate or supplemental environmental review but, at the same time, asserts that "new" information presented after certification of the final EIR should have entered the findings and statement of overriding considerations based on the final EIR.

We recognize appellants' disagreement with the Regents' findings regarding the adequacy of the stated mitigation measures to effectively reduce the potentially significant geohydrological impacts of the project to less-than-significant. Nevertheless, substantial evidence in the record supports the Regents' rationale for concluding that the measures avoid or substantially lessen the significant environmental effects as identified in the final EIR. (Guidelines, § 15091, subds. (a)(1), (b); see *Vineyard*, *supra*, 40 Cal.4th at p. 435 [characterizing the review of agency findings regarding adequate mitigation of project impacts described in an EIR as a question of substantial evidence]; *Laurel Heights I*, *supra*, 47 Cal.3d at pp. 407–409.)

The record shows that in assessing the project impacts on geology and soils, the University investigated the Hagar site using "three separate methodologies" (geotechnical, geologic, and geophysical investigation). These included the exploratory boring program across the development area to "understand the general subsurface conditions and establish the baseline for the geophysical survey," followed by a geophysical survey of the site using electromagnetic mapping, seismic refraction, and microgravity mapping, which provided "information regarding the depth to bedrock (marble) under the site and mapped the areas of interpreted karst related features."

The University followed these investigations with additional borings in areas identified as having a "higher potential for karst hazard" as well as "a geologic

27

evaluation" that addressed the karst hazard on the site. The final EIR explains in response to comments that the provision for "[c]ontinued review of design and construction by qualified geotechnical professionals" does not defer "ultimate solutions" but ensures that the project's design and build follows the geotechnical recommendations and incorporates "any additional site-specific investigation needed to determine final project foundation and design." On this record, there is enough evidence that "a fair argument can be made to support" the Regents' determination that the geological mitigation measures ensure appropriate methods during construction to identify and mitigate any voids larger than the design specification and to reduce the risk of settlement or collapse due to construction on karst formations. (Guidelines, § 15384, subd. (a).)

We also conclude that substantial evidence in the record supports the Regents' findings related to the effects of runoff from the Hagar site on water quality, subsidence and erosion, and possible formation of a sinkhole. The final EIR provides support for each of the Regents' findings. With respect to the finding that discharge from runoff "is not expected to adversely affect water quality" and will be verified by mitigation measure HYD-3A, the final EIR explains that while runoff from the proposed development on the Hagar site "could adversely affect water quality," "the treatment of the discharged stormwater for water quality will be required to meet the UC Santa Cruz Post Construction Requirements" based on implementation of a collection system using bio-filtration and metering. The discharged water will also need to meet "operational best management practices implemented under" the campus's "MS4 permit" (under the Central Coast Regional Water Quality Control Board).

The final EIR similarly addresses the basis for the Regents' finding that measures HYD-3B and HYD-3C reduce the potentially significant impact associated with erosion and sedimentation in Jordan Gulch. Regarding the basis for requiring a 60-foot buffer between stormwater discharge and nearby infrastructure, the final EIR explains that the buffer "is a conservative recommendation" based on the composition of the Jordan Gulch

28

and in the "remote event" that the floor of the Gulch were to settle or collapse. The final EIR explains that implementing a graded filter in the event of a sinkhole is a "method of sinkhole repair that allow[s] for downward seepage of water while retaining the soil so as to prevent any further sinkhole collapse." As the Regents note in response to the arguments on appeal, the purpose of mitigation measure HYD-3C (with respect to a possible sinkhole in Jordan Gulch) is not sinkhole prevention but mitigation of water quality impacts through additional filtration measures. Thus, while HYD-3A requires ongoing treatment and sampling of storm water runoff from the Hagar site, HYD-3B and HYD-3C provide additional mitigation measures against water quality impacts based on the risks of erosion, sedimentation, and sinkhole formation.

Although appellants dispute the adequacy and efficacy of these mitigation strategies, they have not shown that the findings lack a sufficient factual foundation in the record. As our high court explained in addressing a neighborhood association's challenge to the mitigation findings of the Regents in *Laurel Heights I*, "the issue is not whether there is evidence to support the [a]ssociation's objections to the EIR, but only whether those objections show there is not substantial evidence to support the Regents' finding of mitigation." (*Laurel Heights I*, *supra*, 47 Cal.3d at p. 413.) Appellants cite the Aley analysis as evidence of the many alleged shortcomings in the University's geohydrological investigations and the risk of sinkholes and water quality degradation. However, a showing of contrary evidence in the record does not negate the sufficiency of the findings, which we conclude are supported by substantial evidence in the record.

### 3. Marina Campus Alternative

Appellants challenge the Regents' failure to consider, in their reapproval decision, the University-owned, satellite campus in Marina as a feasible alternative for the housing project. Appellants first suggested the Marina alternative for the Regents' consideration in their March 16 comments prior to the reapproval determination. The single-paragraph reference asserts that the University "owns 500 acres in Marina that already have land use

entitlements and infrastructure allowing their development as a satellite campus," making it a "potentially feasible" off-campus alternative location for a satellite campus that "could provide less expensive student housing with less environmental damage than further expansion of the [University's Santa Cruz] campus." Appellants contend that, contrary to the duty of an agency to not approve projects with potentially significant environmental impacts when there are feasible alternatives that might avoid or reduce those impacts (§ 21002; see Guidelines, § 15126.6, subd. (a)), the Regents proceeded with the 2021 project approvals despite this feasible alternative.

We reject the contention that the Regents violated CEQA by failing to consider the Marina alternative in the findings and statement of overriding considerations. For the reasons previously discussed, appellants' argument is barred to the extent it implies that the final EIR should have analyzed the Marina parcel as an alternative to the project, or that the range of alternatives discussed in the final EIR is inadequate. (See *Laurel Heights II*, *supra*, 6 Cal.4th at p. 1130.) The requirement that the agency "describe a range of reasonable alternatives to the project, or to the location of the project, which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project" (Guidelines, § 15126.6, subd. (a)) is specifically in reference to the contents of the EIR. It does not support an argument that alternatives introduced outside the scope of an adequate EIR must be newly considered (absent a basis for supplemental environmental review).

It is no longer possible for appellants to challenge the final EIR, the certification of which this court upheld in *EMAC*. (*EMAC*, *supra*, H048695.) Appellants' arguments that the University has repeatedly failed to consider the availability and potential feasibility of the "satellite campus" alternative in the City of Marina, "not just in its [draft EIR] and [final EIR] for this [p]roject" but also in its findings and statement of overriding considerations for its 2021 project approvals are inconsistent with the recognition that the merits of the underlying environmental review are not at issue in this litigation.

30

Apart from asserting that the Regents failed under CEQA to consider the Marina alternative in the findings, appellants do not otherwise challenge the reasons given for rejecting the seven alternatives to the project identified in the final EIR, as well as other alternatives proposed by members of the public and addressed in the revised draft EIR and final EIR. As to each of the seven alternatives analyzed in the final EIR, the findings provide a detailed summary and brief rationale for the Regents' conclusion that the alternative is infeasible and/or less desirable than the proposed project. The findings further incorporate the responses to comments in the draft EIR and final EIR addressing alternatives proposed by the public during the comments period and explaining why those alternatives "either could not satisfy most of the objectives of the proposed [p]roject, . . . or could not be feasibly accomplished in a successful manner considering the economic or environmental or technological factors involved." The findings conclude that the Regents "independently reviewed and considered the information on alternatives provided in the [f]inal EIR and in the administrative record" and find that each of the alternatives analyzed "either fail to avoid or substantially lessen the [p]roject's significant impacts . . . or are infeasible under CEQA and the CEQA Guidelines, including because the alternatives fail to meet project objectives or are impractical or undesirable from a policy standpoint." (Boldface omitted.)

Appellants claim that the Regents could not have " 'properly' " exercised their duty to analyze these alternatives, since they never considered the Marina site as an alternative that could potentially alleviate the impacts of enrollment growth on the Santa Cruz campus by accommodating that growth in a satellite campus. This argument misconstrues the scope of the required findings, which as stated in the Guidelines includes the determination that "[s]pecific economic, legal, social, technological, or other considerations, . . . make infeasible the mitigation measures or *project alternatives identified in the final EIR*." (Guidelines, § 15091, subd. (a)(3), italics added.)

Appellants challenge the argument advanced by the Regents that the off-campus site would necessarily be infeasible, including because it would not accomplish the primary purpose of the project to develop on-campus housing.  Citing this court's decision in *Habitat & Watershed Caretakers v. City of Santa Cruz* (2013) 213 Cal.App.4th 1277, 1305 (*Habitat*), appellants assert that an agency may not dismiss a feasible alternative based on " 'the *unanalyzed theory* that such an alternative *might not* prove to be environmentally superior to the project.' "  We disagree that this authority supports appellants' contention.

The omission of the Marina alternative from the Regents' findings is not analogous to the omission of a limited-water alternative from the range of alternatives included in the draft and final EIRs in *Habitat*.  Appellants assert that the Regents "preemptively rejected the Marina site alternative before analyzing its benefits and impacts" on the " 'unanalyzed theory' that only massive growth on the main campus would meet the basic objectives of and minimize the impacts of the [p]roject."  This argument conflates a cognizable challenge to the range of alternatives that must be discussed in a draft and/or final EIR (*Habitat*, *supra*, 213 Cal.App.4th at p. 1305) with the novel proposition that an unanalyzed alternative proposed long *after* the statute of limitations period has ended for challenging the adequacy of the underlying EIR must be given the same consideration as the alternatives identified during the environmental review process.

Appellants fail to acknowledge that while the final EIR does not specifically address the Marina alternative (which was not among the alternatives identified by the University or suggested at the time by members of the public), it does address several off-site alternative locations suggested by commentators for some or all of the project.  These comments suggested the University consider "shifting some of the proposed student growth to other UC campuses" or moving students to remote learning or other campuses.  Appellants do not challenge the Regents' rejection of these other alternatives in the

findings, which we conclude are supported by substantial evidence in the record. We therefore reject appellants' challenge to the Regents' approval of the project based on their alleged failure to consider the feasibility of constructing housing on the Marina campus.

### III. DISPOSITION

The judgment is affirmed. Respondents are entitled to their reasonable costs on appeal. (Cal. Rules of Court, rule 8.278(a)(2).)

_____
                    Danner, J.


WE CONCUR:




_____
Bamattre-Manoukian, Acting P.J.




_____
Wilson, J.




**H050745 -** *Habitat and Watershed Caretakers et al. v. The Regents of the*
*University of California et al.*